[Crim. No. 10591. In Bank. May 28, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. CHARLES ROBERT COOGLER, Defendant and Appellant.

Eric A. Rose, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Gordon Ringer, Deputy Attorney General, for Plaintiff and Respondent.

TOBRINER, J.—The District Attorney of Los Angeles County filed two informations against defendant charging five offenses defendant allegedly committed on February 18, 1966. The trial court consolidated the two proceedings. Count I charged defendant with the murder of Helen Beal (Pen. Code, § 187) ; count II charged defendant with the murder of Judy Gibson (Pen. Code, § 187) ; count III charged defendant with assaulting Gilbert Montoya with intent to commit murder (Pen. Code, § 217) ; count IV charged defendant with robbing Mrs. Gibson and Mr. Montoya while armed with a deadly weapon (Pen. Code, §§ 211, 211a) ; count V charged defendant with kidnaping Montoya to commit robbery with bodily

harm. (Pen. Code, § 207; see Pen. Code, § 209.) The information also alleged that defendant had suffered five prior convictions; defendant admitted these before the trial.

The defendant pleaded not guilty. He did not also enter a plea of not guilty by reason of insanity; he did, however, rely on a theory of diminished capacity at the guilt phase. On the first two counts (the murder counts) the trial court gave instructions on first degree premeditated murder and felony murder (killing in the course of a robbery or burglary), second degree murder, and voluntary and involuntary manslaughter. The jury found defendant guilty of first degree murder on the first two counts, and guilty as charged on the remaining three counts. At the penalty phase the same jury prescribed the death penalty for defendant on the two murder counts and on the kidnaping to commit robbery count. The trial court deferred sentencing on the assault and robbery counts pending return of the remittitur. Defendant moved for a new trial and for reduction of the death sentences (Pen. Code, § 1181, subd. 7). The trial court denied both motions. This appeal is automatic. (Pen. Code, § 1239. subd. (b).)

We summarize the evidence against defendant. Sometime after 12:30 p.m. on February 18 Miss Helen Beal was fatally shot in the back. Neighbors discovered her body in her living room. Miss Beal lived alone; defendant's brother served as her gardener; defendant had spent several days the previous summer painting her house.

The homicide investigator found neither signs of forced entry in the Beal home nor any of defendant's fingerprints in the house. The ballistics expert testified that a bullet removed from Miss Beal's body had been fired from the gun taken from defendant at the time of his arrest on the evening of February 18. The arresting officers also found some silver dollars, old coins, and an 1855 gold coin in defendant's pockets; the letters "BEAL" were engraved on the back of the gold coin. Miss Beal had collected coins and silver dollars.

The Seaboard Finance Company branch office in a shopping center in Pico-Rivera engaged as their sole employees Mr. Montoya and Mrs. Gibson. Around 5:30 p.m. on February 18 Montoya left the office on business; upon returning at 6 p.m. he did not see Mrs. Gibson but did observe defendant behind the counter at the cash drawer. Defendant turned, pulled out a small pistol, and told Montoya to raise his hands and go to the back of the office. Montoya complied, walking into the men's restroom. Defendant closed the door of the restroom

behind Montoya and told him to stay there. For two or three minutes Montoya did not hear anything; then defendant opened the door to the restroom and told Montoya to raise his hands and turn around again. Defendant then shot him in the back. As Montoya fell to the ground he heard two more shots. He then heard a door open, a woman's scream coming from the ladies' restroom in the back of the office, and another shot.

Several women working in a beauty shop next door to the Seaboard office testified that at about 6 p.m. they heard gunshots and a woman's scream coming from the Seaboard office. Three of the women, after hearing the shots, looked through the front window of the Seaboard office and saw defendant inside, behind the counter, doing something with his hands. They returned to the salon and called the police. Then Montoya walked out of the Seaboard office and onto the sidewalk, and there he collapsed. The women from the beauty salon came to his aid.

At about the time Montoya fell to the sidewalk. the women heard a car door slam and saw defendant drive slowly away in a 1956 white Buick. A customer of the beauty shop wrote down the license number of the car. The women discovered Judy Gibson lying mortally wounded in the ladies' room.

At 8 p.m. that evening two officers in an unmarked car approached defendant's home; they observed him sitting in a parked car. At that point defendant's wife left the car and entered the house. When the officers turned around and drove back toward defendant he started the car, and a high-speed chase followed. About four miles from his home defendant lost control of his car; it crashed into a building; the police approached him and took him into custody. The arresting officers found a small four-barreled pistol containing two live rounds of ammunition and two empty cartridges, a box of .22 caliber shells, the coins mentioned above, $141 in paper currency, and three keys and a key ring normally kept in Montoya's desk.

The surgeon who gave emergency treatment to Montoya found four wounds and removed two bullets. Although the ballistics expert testified that one of the bullets was too damaged to be analyzed, he stated that the other had been fired by the pistol found on defendant. He also testified that a bullet removed from Mrs. Gibson had been fired from that pistol. The pathologist who peformed the autopsy on Mrs. Gibson testified that she died of a gunshot wound in the chest with pene-

tration of the heart and that she was probably standing when shot.

The regional manager of Seaboard testified that an audit showed a shortage of about $141 in currency at the branch office where Montoya and Mrs. Gibson worked. Defendant had personally applied to Seaboard for a loan of $120 for income tax on February 14, 1966; he had received a check from the same branch office two days later. Montoya testified, however, that he did not recognize defendant when he reentered the office on February 18, and that during the entire episode defendant showed no signs of recognizing him.

Defense witnesses testified that on the day of the commission of the crimes defendant, who ordinarily worked a 4 a.m. to 12:30 p.m. shift, left work at 8 a.m., having asked for the rest of the day off. He picked up his wife at the supermarket at 9 a.m.; he took her home; she did not see him again until 8 p.m. that evening. We shall set forth, *infra,* the other testimony offered by the defense.

Defendant challenges the jury's determination of guilt on several grounds: (1) Penal Code section 209 impairs the effective exercise of his right to trial by jury; (2) the trial court should not have instructed the jury on first degree premeditated murder because the evidence of defendant's diminished capacity to premeditate and deliberate was uncontradicted; (3) the trial court committed error in not entering a plea of not guilty by reason of insanity on its own motion in defendant's behalf. We shall explain why we find no merit in these contentions and (4) further explain why no other error at the guilt phase requires reversal. The court did not improperly excuse certain prospective jurors. (*Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770].) As to the jury's determination of penalty we affirm the judgment imposing the death penalty on the two murder counts and on the kidnaping to commit robbery count.

1. *Section 209 of the California Penal Code does not impair the effective exercise of the Sixth Amendment right to trial by jury.*

Defendant first contends that section 209 of the Penal Code, pursuant to which he was convicted and sentenced to death on count V of the information, impairs the effective exercise of his Sixth Amendment right to trial by jury. Section 209, which prescribes the punishment for various types of kidnaping, reads in relevant part: "Any person . . . who kidnaps or carries away any individual . . . to commit rob-

bery . . . is guilty of a felony and upon conviction thereof *shall suffer death or* shall be punished by *imprisonment* in the state prison for life without possibility of parole, *at the discretion of the jury trying the same,* in cases in which the person or persons subjected to such kidnaping suffers or suffer bodily harm. . . .'' (Italics added.) In substance, defendant argues that his decision whether to demand trial by jury should not be influenced by the possibility that the jury might impose a greater punishment, in this case death, than the penalty which a judge, sitting without jury, may decree.

Defendant relies heavily on the recent decision in *United States* v. *Jackson* (1968) 390 U.S. 570 [20 L.Ed.2d 138, 88 S.Ct. 1209], in which the United States Supreme Court construed similar language in the Federal Kidnaping Act[1] to authorize the death penalty only upon recommendation of a jury (390 U.S. at p. 572 [20 L.Ed.2d at p. 141]) and held that the statute, as construed, discouraged ''assertion of the Fifth Amendment right not to plead guilty and [deterred] . . . exercise of the Sixth Amendment right to demand a jury trial.'' (390 U.S. at p. 581 [20 L.Ed.2d at p. 147], fn. omitted.)

In contrast, however, to the Federal Kidnaping Act as interpreted in *Jackson,* section 209 of the Penal Code, as previously construed by this court, permits either the jury *or* the trial court sitting without a jury to impose the death penalty. In *People* v. *Langdon* (1959) 52 Cal.2d 425, 433 [341 P.2d 303], affirming the imposition of the death penalty by a trial court sitting without a jury in a section 209 prosecution, we held: ''When a jury trial is waived, the trial court in a criminal case has the same discretionary power with regard to sentencing as is given a jury when they are the triers of fact.''[2] In view of our earlier construction of section 209 in *Langdon,* defendant's decision whether to demand a jury trial could not have been affected by an alleged absence of power in the trial court sitting without a jury to impose the death penalty.

[1] ''Whoever knowingly transports in interstate . . . commerce, any person who has been unlawfully . . . kidnaped . . . and held for ransom . . . shall be punished (1) by death if the kidnaped person has not been liberated unharmed, and if the verdict of the jury shall so recommend, or (2) by imprisonment for any term of years or for life, if the death penalty is not imposed.'' (18 U.S.C. § 1201(a).)

[2] *Langdon* also holds that the provisions of Penal Code section 190.1, regarding separate proceedings on the issue of penalty, apply to a prosecution for a capital offense under section 209. (*People* v. *Langdon, supra,* 52 Cal.2d 425, 433.)

2. *The trial court properly instructed the jury on first degree premeditated and deliberate murder.*

Defendant urges that the evidence of his diminished capacity established as a matter of law that the murders of Helen Beal and Judy Gibson could not have been deliberate and premeditated; he argues that the trial court should not have instructed the jury that it could convict defendant of first degree murder on this theory. He contends that, instead, "the trial court should have reduced the degree of the crimes to second degree murder" on the basis of the experts' testimony of diminished capacity. Thus, although sufficient evidence obviously supported the trial court's instructions on first degree felony murder (robbery and burglary) we must additionally decide whether substantial evidence supported the instruction on the alternative theory of first degree murder. (See *People* v. *Risenhoover* (1968) 70 Cal.2d 39, 51 [73 Cal. Rptr. 533, 447 P.2d 925].)

We summarize the evidence presented by defendant at the guilt phase which bears upon this issue. Starting with defendant's performance on the job, we note that the record shows that the plant superintendent at Bell Brands Foods testified that he had hired defendant in November 1965 as a general laborer. Defendant did his work satisfactorily and appeared eager to do well; he maintained a good attendance record.

Turning to the testimony as to defendant's emotional and mental state, we find that Mrs. Elsie Owens, defendant's sister, stated that defendant was the ninth of twelve children. Defendant's father treated the children with great severity; on one occasion he knocked defendant across the room, necessitating several stitches in defendant's head. After that incident defendant often appeared to be deeply depressed and would stare into space during one of these states, not responding unless directly addressed.

Mrs. Chapman, a former neighbor of defendant, testified that defendant, while visiting her, frequently complained of headaches. When at times he attempted to use the telephone he would be unable to dial the correct number; she observed that he would sometimes dial the address rather than the telephone number of the person he wanted to reach.

Mrs. Coogler, defendant's wife, testified that during two or three weeks preceding the homicides defendant, while driving, would run off the side of the road. Once, while waiting for a traffic light, he had "another of those quiet spells." During

such a spell he would sit at home "for quite a while" and stare into space. At one time defendant tried to commit suicide. On the date of the homicides defendant picked her up at the supermarket about nine in the morning; he appeared quieter than usual. She did not see him again until eight that evening.

Dr. John Suarez, a psychiatrist, testified that he had seen defendant on five occasions in June 1966 and had spent about an hour with him each time. He also conducted a one-hour interview with defendant's wife. He obtained information about defendant's background from these sources. He also arranged for defendant to be examined by a clinical psychologist and by a neurologist.

Dr. Suarez described defendant during his early years as subject to the domination of his alcoholic father, who tended to be physically abusive. Because of the crowded quarters of the house, defendant lived with his grandmother during some of his childhood. When his family moved from Tennessee to Georgia he accompanied them but thereafter was placed in various foster homes because of his disastrous relationship with his father. As he grew older he spent some time in reform schools; when 17 he sustained a sentence to prison for car theft. Since that time he has been in penitentiaries on several occasions for various offenses; he has had difficulty adjusting to the discipline of prison life. Many of the offenses for which he was incarcerated were characterized by apparently purposeless destruction of property.

In 1958 he married; his wife and he have two children. The family moved to California in 1964; defendant incurred no difficulties until the tragic events of February 18, 1966.

According to Dr. Suarez, defendant could not recall many of his activities on that day. He could summon only a dim memory of the events after he left work at 8 a.m. that morning. He remembered going home for a few hours after leaving work. Later he drove to his brother's house, but found no one home. Thereafter he first went to a bar, where he had a few beers, and then to a race track. He did not remember how long he stayed at the track or what he did there. After leaving, he went to another bar and drank more beer. He recalled no subsequent events until he arrived at the Seaboard office. He remembered shooting the gun, but not at whom or how many times. He vaguely recalled leaving the Seaboard office, driving home, and trying to escape the police. He had no recollection of going to Miss Beal's home.

Dr. Suarez concluded that on February 18 defendant endured a disassociation reaction. He explained that term as follows: "[W]hen this phenomenon occurs, there is some basic rearrangements of the mind to the point that there is impairment of consciousness in that several areas of the mind that are normally available and participate in mental work are rendered unavailable or are walled off. These parts that are sort of, again, rendered unavailable are typically those things that have to do with either a particular set of standards or attitudes or a set of restrictions or set of controls that normally are effective and operative."

Defendant had experienced many similar disassociation reactions in the past. Such an attack commences with a feeling of disinterest and apathy. He then suffers a sensation of fullness in the head and often a headache. He encounters trouble concentrating during this period, and his performance of activities such as driving can be seriously impaired. During such a state the slightest sound or sight can irritate him greatly; at times he enters a state of uncontrollable rage and becomes destructive of property. When he emerges from one of these spells he can recollect little or nothing of what has occurred. The reaction of February 18, as described by defendant to the doctor, typified previous disassociations in many respects, but lasted longer, over 12 hours, and of course caused far more destruction than any other.

Dr. Suarez observed that defendant, even when he was not suffering an attack, appeared to be chronically depressed. He suffered from a mild memory impairment but was well oriented as to time and place. He denied having visual or auditory hallucinations except that at one time in the past he had heard music at his place of work.

The doctor concluded that defendant was suffering either from organic brain damage similar to psychomotor epilepsy, possibly caused by head injuries, or from a functional disorder or from both.[3] Dr. Suarez described the functional disorder as a chronic schizophrenic reaction with paranoid and catatonic features. Although defendant appears superficially intact as to his emotional control and intellect, he can become acutely psychotic. The doctor defined a psychotic state as en-

---

[3] He stated that he based his diagnosis of probable organic disorder on his observations of defendant, defendant's statements to him concerning defendant's family background and recollection of the crimes, and the report of the clinical psychologist, discussed *infra*. He based his diagnosis of probable schizophrenic disorder on these factors and the report of the neurologist, discussed *infra*.

compassing any or all of the following features: (1) significant intellectual impairment involving the ability to perceive accurately and be aware of what is occurring; (2) impairment of emotional reactions, either experiencing no feelings or experiencing excessive feelings; (3) a chronic failure to adjust to and get along with other people.

Doctor Suarez also concluded that defendant could exert no conscious control over the onset or duration of these spells; external or internal stress could cause them; the doctor stated that perhaps defendant's deteriorating relationship with his wife had provoked the disassociation reaction of February 18. During such a spell, the doctor noted, the likelihood of destructive conduct on the part of defendant greatly enhances.

On cross-examination of Dr. Suarez the prosecutor emphasized that the doctor had based his conclusions as to defendant's state of mind at the time of the homicides on defendant's recollection of the incidents and his narration of previous behavior and physical condition; Dr. Suarez admitted that he had not read any police reports or the preliminary transcript and was familiar only with the general details of the crimes. The doctor also admitted that he had not questioned defendant in detail about the circumstances of his previous offenses. After stating that he had not inquired why defendant killed Judy Gibson, Dr. Suarez said in response to a further question that the thought that defendant might have killed her to prevent his identification "did not enter my mind."[4]

Dr. Davis, a neurologist, stated that he had seen defendant for three hours on June 8. He spent an hour and a half taking a personal history of defendant and also conducted a physical and neurological examination including an electroencephalogram. The testing showed no signs of organic damages

---

[4]Dr. Suarez stated later in response to a question by the trial court that he "had a feeling that somewhere there must be some sort of explanation, psychologically speaking [for the murder of Helen Beal]. I was struck by the fact that both of the victims were female . . . people who had given him something or who had been good to him . . . and in that way it is hard to resist the temptation of equating such figures to the mother figure of the individual, and that perhaps symbolizes these people represented the maternal figure for whom there must be some hatred, some anger, some wish to do away with."

When the court asked him to explain why defendant took money from both places the doctor speculated that the money may have been symbolic of "something good to be given or to be received" but pointed out that these observations "are the sort of things that could only be really stated with any degree of assurance after a much more sensitive analysis of the individual."

but certain features in his past behavior suggested some organic dysfunction—episodic headaches, rage reactions, depressions involving impairment of intellect and memory. His manner and his past behavior suggested that he was probably schizophrenic or at least manifested such tendencies.

Dr. Tobin, a clinical psychologist, gave defendant several tests. The results of one of these tests indicated organic brain damage causing some perceptual motor disorder. Examinations designed to test memory revealed that defendant's memory of verbal material was normal but his recall of visual material was limited. His scores on these examinations did not fall within the range showing brain damage affecting memory, but certain features of his performance did suggest such damage. On an intelligence test defendant scored 87, within the dull normal range.

Dr. Tobin also administered the Minnesota Multiphasic Personality Inventory, a "personality" test which reveals emotional functioning. The answers defendant gave to the questions showed that he had difficulty concentrating, was a chronic worrier, tended to over-react to danger, was fearful of getting close to people, and was guilt-ridden. In a sample of persons with a similar personality profile "58% were diagnosed as schizophrenic." Dr. Tobin also administered the Rorschach inkblot test and concluded from defendant's performance that although he showed no clear evidence of psychotic thinking he did evidence paranoid tendencies and lack of inner resources. Dr. Tobin concluded that defendant probably suffered organic brain damage; he also was a borderline schizophrenic, one who under stress may become psychotic for periods of time.

Defendant also offered evidence from two other lay witnesses. Victor Stelly, a supervisor at defendant's place of work, testified that during the first week in February a fellow worker had accidentally bumped into defendant's machine. Defendant became very upset, almost to the point of rage, and called the other employee stupid and told him to be more careful.

Counsel stipulated that if Reverend Roberson were called he would testify that in 1960, when he served as the chaplain in a Tennessee prison, defendant, an inmate there, told him that he had spells of rage which he could not later fully remember. He was afraid that he might kill someone during such a state.

Having set forth a complete summary of the defense

case above, we hold that the trial court properly gave the first degree deliberate and premeditated murder instructions because the jury could properly have disregarded the expert testimony as to defendant's diminished capacity (Pen. Code, § 1127b).

We recognize that the prosecution produced no expert witnesses of its own to contradict the defense testimony that defendant suffered from a disassociation reaction stemming either from organic or functional mental illness at the time he committed the acts charged. ■ Although unanimity of expert opinion carries persuasive value (see, e.g., *People* v. *Ford* (1966) 65 Cal.2d 41, 55 [52 Cal.Rptr. 228, 416 P.2d 132]), a jury, under certain circumstances, can properly reject such opinions. ■ As we recently explained in *People* v. *Bassett* (1968) 69 Cal.2d 122, 141 [70 Cal.Rptr. 193, 443 P.2d 777], " 'The chief value of an expert's testimony in this field, as in all other fields, rests upon the *material* from which his opinion is fashioned and the *reasoning* by which he progresses from his material to his conclusion . . . .' " (Quoting *Carter* v. *United States* (D.C. Cir. 1957) 252 F.2d 608, 617 [102 App.D.C. 227].)

■ Reviewing the evidence in the instant case we conclude that a jury could properly reject the expert's conclusions because of doubt as to the material upon which these conclusions were based. Dr. Suarez reached his conclusions on the basis of the history related to him by defendant and, to a lesser extent, defendant's wife.[5] He also testified that he based his conclusions on his observations of defendant during the interviews and on the psychologist's report. As to defendant's appearance during the interviews, however, Dr. Suarez merely testified that defendant appeared depressed; such an observation cannot in itself substantiate a conclusion that defendant lacked capacity to deliberate and premeditate the killing. The psychologist's diagnosis was based upon his interpretation of the tests performed by defendant; we have summarized Dr. Tobin's testimony above and we see no indication that would compel a jury to conclude that defendant could not "*maturely* and *meaningfully reflect* upon the gravity of his contemplated act." (*People* v. *Goedecke* (1967) 65 Cal.2d 850, 857 [56 Cal.Rptr. 625, 423 P.2d 777].) Defendant apparently did experience some difficulty in perceptual motor performance and suffered from a mild memory impairment.

---

[5]He saw Mrs. Coogler for one hour, but did not in his testimony identify wherein he based his conclusions on her statements.

The Minnesota Multiphasic Personality Inventory showed that he had features in his makeup characteristic of many schizophrenics, but those features, described above, would not require the jury to conclude that defendant lacked appreciation of "the enormity of the evil" contemplated. (*People* v. *Wolff* (1964) 61 Cal.2d 795, 822 [40 Cal.Rptr. 271, 394 P.2d 959].)

"This was not a bizarre crime whose very character pointed to dissolution of the accused's deliberative faculties." (*People* v. *Chapman* (1968) 261 Cal.App.2d 149, 165 [67 Cal.Rptr. 601].) (Compare *People* v. *Bassett, supra,* 69 Cal.2d 122; *People* v. *Nicolaus* (1967) 65 Cal.2d 866 [56 Cal.Rptr. 635, 423 P.2d 787]; *People* v. *Goedecke, supra,* 65 Cal.2d 850; *People* v. *Wolff, supra,* 61 Cal.2d 795.) The prosecution's evidence generates the inference that after committing the robbery defendant shot at his victims to avoid identification. (See *People* v. *Risenhoover* (1968) 70 Cal.2d 39, 52-53 [73 Cal.Rptr. 533, 447 P.2d 925]; *People* v. *Nye* (1965) 63 Cal.2d 166, 172-173 [45 Cal.Rptr. 328, 403 P.2d 736].) Dr. Suarez did speculate that defendant might have killed the women because of a hatred of mother figures, but such an explanation took no account of the fact that defendant had almost fatally wounded Mr. Montoya; moreover, it "did not enter [the psychiatrist's] mind" that defendant might have shot at his victims in order to avoid identification.

Nothing in the testimony of the prosecution witnesses suggested that defendant behaved in an abnormal or irrational manner during the actual commission of the crimes (compare *People* v. *Ford* (1966) 65 Cal.2d 41 [52 Cal.Rptr. 228, 416 P.2d 132]; *People* v. *Ford* (1964) 60 Cal.2d 772 [36 Cal.Rptr. 620, 388 P.2d 892]). As Dr. Suarez conceded, he had not examined the transcripts of the preliminary hearing or any police reports; thus he had not been afforded an opportunity to search for any indicia of defendant's external behavior that might give some clue to his internal behavior. In short, a jury in considering defendant's capacity to premeditate and deliberate could properly accept defendant's evidence *or* it could equally properly reject the lone psychiatrist's opinion[6]

[6]Dr. Tobin, the psychologist, gave his probable diagnoses of defendant's mental defects but did not purport to explain how these defects were related to defendant's mental processes. (See *People* v. *Bassett, supra,* 69 Cal.2d 122, 144.)

Defendant's lay witnesses did not substantially bolster Dr. Suarez's conclusions. The head injury described by defendant's sister did not appear on tests designed to determine organic brain damage; his sister's and wife's testimony about his quiet behavior while in a "spell" bore

based upon defendant's self-serving descriptions of his alleged past blackouts and lack of memory of the acts in question.

Although defense counsel argues that "punishment by death of appellant under the uncontradicted medical expert testimony of the case at bar violates his constitutional rights," the decision of this court in *In re Anderson* (1968) 69 Cal.2d 613, [73 Cal.Rptr. 21, 447 P.2d 117], presently disposes of that contention.

3. *The trial court did not commit error in failing to enter an insanity plea on behalf of defendant on its own motion.*

 Defendant declined to enter a plea of not guilty by reason of insanity in addition to his plea of not guilty. (See Pen. Code, § 1016.) Nevertheless, he now urges that the trial court on its own motion should have entered such a plea on his behalf.

Penal Code section 1018 states that with certain exceptions not relevant here, "every plea must be put in by the defendant himself in open court."[7] This section places the responsibility for entering a plea upon defendant and his counsel. The trial court has no responsibility, and under our adversary

---

no relation to his destructive behavior as observed by other witnesses on the day of the crime. Defendant's difficulty in concentration described by a former neighbor, and the single incident of an angry, but not physically violent, reaction to a fellow employee do not appear significant.

[7]Under Penal Code section 1024 if the defendant refuses to enter any plea a plea of not guilty must be entered. The trial court *does* have the responsibility to initiate on its own motion the statutory procedures under Penal Code section 1368 if it entertains a doubt as to defendant's present sanity. (See generally, *People* v. *Pennington* (1967) 66 Cal.2d 508 [58 Cal.Rptr. 374, 426 P.2d 942]; cf. *Pate* v. *Robinson* (1966) 383 U.S. 375 [15 L.Ed.2d 815, 86 S.Ct. 836].) The court holds a hearing to determine 'sanity'' under section 1368, to establish whether defendant "is able to understand the nature and purpose of the proceedings taken against him and to conduct his own defense in a rational manner." (*People* v. *Merkouris* (1959) 52 Cal.2d 672, 678 [344 P.2d 1].) The factors which may tend to establish a defendant's disability under section 1367, forbidding the trial of a person while insane, do not necessarily coincide with those which would tend to establish that he was insane under the M'Naughton test at the time he committed the acts for which he is being tried. (*People* v. *Pennington, supra,* 66 Cal.2d 508, 516.)

Having reviewed the record, we find no substantial evidence tending to show that defendant did not understand the nature of the proceedings against him or was unable to assist in his own defense; defense counsel does not contend that the trial court should have ordered a hearing under section 1368. Defendant's alleged mental disability at the times of the commission of the crimes avowedly stemmed from a contemporaneous disassociation reaction; the record does not show that defendant experienced any such reaction during the proceedings against him.

system should have no responsibility, to conduct the defense of an accused represented by counsel.

 Defendant contends that the trial court should have relieved his counsel and ordered a substitution because of counsel's failure to enter an insanity plea. As we indicated in *Smith* v. *Superior Court* (1968) 68 Cal.2d 547, 559-562 [68 Cal.Rptr. 1, 440 P.2d 65], a trial court can only relieve counsel on its own motion when there is objective evidence of "physical incapacity to proceed with a meaningful defense of his client, such as illness, intoxication, or a nervous breakdown . . . ." No such physical incapacity appears present in this case. If, as here, the defendant questions counsel's skill and judgment, he must show that "counsel's lack of diligence or competence reduced the trial to a 'sham or farce.'" (*People* v. *Ibarra* (1963) 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487].)

 The record before us, however, casts no doubt on counsel's competence; he repeatedly demonstrated his familiarity with the total and partial defenses based on mental illness or disability. (Cf. *People* v. *McDowell* (1968) 69 Cal.2d 737, 738-739 [73 Cal.Rptr. 1, 447 P.2d 97].) His decision not to enter an insanity plea may have been based upon a fear that such a plea would prejudice his client's claim of diminished capacity; if the jury knew that an insanity hearing would follow in the event of defendant's conviction, it might treat summarily the psychiatric testimony as to whether defendant could form the requisite intent to commit the crimes charged.

4. *Defendant's other contentions do not establish prejudicial error at the guilt phase.*

a. *Instruction on involuntary manslaughter*

The trial court gave instructions on first degree felony murder (committed in the perpetration of or attempt to perpetrate robbery or burglary), first degree premeditated and deliberate murder, second degree murder, and voluntary and involuntary manslaughter. In our independent review of the record we have determined that the trial court committed error in giving the involuntary manslaughter instruction.

The court instructed the jury as follows: "Involuntary manslaughter is a killing in the commission of an unlawful act not amounting to a felony, or in the commission of a lawful act which might produce death in an unlawful manner, or without due caution and circumspection. Thus, if you find that the defendant killed while unconscious as a result of mental disease or defect and was therefore unable to formu-

late a specific intent to-kill or to harbor malice, his killing is involuntary manslaughter.''

Penal Code section 26, subdivision Five, provides that ''Persons who committed the act charged without being con-.scious thereof'' cannot be found guilty. ''Unconsciousness is a complete, not a partial defense to a criminal charge . . . .'' (*People* v. *Baker* (1954) 42 Cal.2d 550, 575 [268 P.2d 705]; *People* v. *Wilson* (1967) 66 Cal.2d 749, 761 [59 Cal.Rptr. 156, 427 P.2d 820].) The trial court, therefore, should have instructed the jury to acquit the defendant if it found that he killed while unconscious.

There is, however, an exception to the general rule. Construing Penal Code section 26, subdivision Five (unconsciousness is a complete defense) in light of Penal Code section 22 (voluntary intoxication is no excuse for crime), this court has held that unconsciousness caused by intoxication voluntarily induced will not excuse criminal homicide. (*People* v. *Conley* (1966) 64 Cal.2d 310, 323 [49 Cal.Rptr. 815, 411 P.2d 911]; *People* v. *Baker, supra,* 42 Cal.2d 550, 575.) In such a case of voluntary intoxication, a finding of unconsciousness at the time of the killing would warrant a conviction of involuntary manslaughter, and not an acquittal.

In the present matter neither party introduced evidence of intoxication.[8] Since this case did not present an exception to Penal Code section 26, subdivision Five, the trial court's instruction (*supra*) cannot be upheld because it allowed the jury to convict defendant of involuntary manslaughter if it found that he killed while unconscious.

The trial court gave the involuntary manslaughter instruction, however, pursuant to defendant's request; the doctrine of invited error applies to bar reversal on appeal. (*People* v. *Phillips* (1966) 64 Cal.2d 574, 580-581 fn. 4 [51 Cal.Rptr. 225, 414 P.2d 353].) The record shows that defense counsel deliberately requested this instruction in his effort to provide the jury with an opportunity to find defendant guilty of lesser offenses rather than force it to return a verdict of acquittal if defendant's psychiatric evidence were accepted.

b. *Error in cross-examination of the defense psychiatric witness*

---

[8]Dr. Suarez testified that defendant had stated that he had consumed a few beers on the morning of February 18. No evidence showed that defendant was intoxicated at that time or at the time he committed the acts charged; the arresting officers both testified that defendant appeared to be sober.

Dr. Suarez formed his opinion of defendant's mental capacity chiefly in reliance on his interviews with defendant. On cross-examination the prosecution sought to discredit the psychiatrist's opinion by suggesting that he had relied on incomplete information and that defendant had not been candid during his interviews. In particular, the prosecutor, outside the presence of the jury, handed Dr. Suarez "a seven-page statement of questions and answers that were allegedly taken of Charles Robert Coogler at 11:15 p.m. on February 18, 1966 . . . ."[9] He asked the doctor to read the statement and stated that he would ask if the information contained in the statement would change the doctor's opinion in any respect.

When cross-examination resumed in the presence of the jury the prosecutor asked the doctor a hypothetical question posing a situation in which defendant had once explained in detail how he had acquired the gun but later told the doctor that he could only vaguely remember from whom he had obtained it. The doctor stated that this discrepancy "may or may not" affect his opinion as to defendant's candor in his interview with the doctor. Dr. Suarez explained that if defendant was still suffering from a disassociative reaction while making the first statement he could then recall his actions during the entire period of disassociation, whereas once the reaction had terminated he would have, at best, only a hazy memory of his activities during that period.[10]

---

[9]The trial court had earlier, in a hearing conducted outside the presence of the jury, held that defendant's statements to the police were inadmissible because the authorities had not complied with *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

[10]"Q [By Mr. Stovitz] Going to the gun, now, Doctor, when he, the defendant, told you that he thinks the gun was his brother-in-law's, did you question him further as to how long he had the gun or whether he got it that same date or anything of that nature?

"A I attempted to ask him about it, only to meet replies to the effect that he did not remember on June 20th, 1966, where he had gotten the gun that he used on February 18, 1966, but that in an earlier conversation that man, with someone else, told him the details of where he had gotten the gun.

"Q Would that alter your opinion as to whether or not that man on June 20th, 1966, was fabricating his testimony to you, his statement to you?

"A It may or may not . . . . [I]t has to do with the timing, getting back to the issue of dissociation reaction. Dissociation reaction is a period which has a more or less discreet beginning and ending. It may not be sharp and clear-cut, so that if a person does something at Time A, and he remains with the period of dissociation at Time B, which is later, he may be able to describe and account for and explain whatever it is at Time A.

"However, if subsequent to Time B the period of dissocation ends

At that point, out of the hearing of the jury, defense counsel pointed out, ''Your Honor, this ... . . . is the defendant's statement which your Honor has suppressed under the Miranda decision. Now, number one, actually the statement, in my judgment, is very little inconsistent. But there was a subsequent statement that the defendant made in the County Jail to one of the Sheriffs which, according to Mr. Stovitz, he said, 'I never was at Beal's house.' . . . I am going to object to any reference to that statement on the grounds of the Miranda case. Now, as to this statement, your Honor, the District Attorney has already given the Doctor this statement. He has asked him hypotheticals about it. *I won't object to hypotheticals* but I will object to any attempt to introduce that statement itself, directly or indirectly.'' (Italics added.) After some discussion the court refused to allow the prosecutor to proceed with cross-examination based upon defendant's statements to the police following his arrest.

In *People* v. *Morse* (1969) 70 Cal.2d 711 [76 Cal.Rptr. 391, 452 P.2d 607], we discussed at length a similar problem. In *Morse* a psychiatrist, a defense witness, on cross-examination was asked whether, in forming his opinion of defendant's state of mind, he had considered defendant's statements to the police obtained in violation of *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], and *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr 169, 398 P.2d 361]. We explained that a defendant's right to remain silent and to the assistance of counsel forbids use of his statements obtained in violation of these rights as a basis for a psychiatrist's evaluation of defendant's guilt or degree of guilt in the absence of the fulfillment of specified conditions. (See *In re Spencer* (1965) 63 Cal.2d 400, 411-413 [46 Cal. Rptr. 753, 406 P.2d 33].) In the instant case the prosecution's use of defendant's statement about his acquisition of the gun did not comply with those conditions.[11]

■ Nevertheless we need not consider what prejudicial

and he essentially reverts back to his normal self, he then, at a later date or later time, see, may not be able to remember anything of Time A. This is well documented and this is why I reply that it may or may not be significant. ''

[11] In *Morse* defense counsel had given the psychiatrist copies of defendant's incriminating statements for use in his evaluation of defendant's condition; we held that this action sufficiently complied with the condition of *Spencer* that defendant's statements made at a psychiatric interview cannot be used against him at trial unless he has consented to that interview on the advice of counsel. In the instant case defense counsel did not provide Dr. Suarez with copies of defendant's statements to the police.

effect, if any, the prosecution's hypothetical use of the statement may have had upon the jury's verdicts. Defense counsel clearly waived the error by stating that he did not object to the use of that statement for the purposes of a hypothetical question. Defense counsel did object to the use of prosecution's reliance upon, or use of, any additional statements of defendant, and the trial court properly sustained such objection before the prosecutor framed any further questions based on the contents of those statements.

5. *The trial court properly excused certain veniremen.*

The court's action in excusing three veniremen did not violate the principles of *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]. In two instances the prospective jurors made "unmistakably clear . . . that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them . . . ." (P. 522, fn. 21 [20 L.Ed.2d at p. 785].)[12] Nor do we find that the court improperly excused the third prospective juror, Mrs. Morris Stokes, because of opposition to the death penalty.

We set forth the circumstances under which the court excused Mrs. Stokes. After the court adjourned on

---

[12]The court questioned Mrs. Sultzbach as follows:
"THE COURT: Mrs. Sultzbach?
"MRS. SULTZBACH: Yes.
"THE COURT: Have you been present now throughout the period of this trial?
"MRS. SULTZBACH: Yes.
"THE COURT: Could you serve as a juror in this proceeding?
"MRS. SULTZBACH: No.
"THE COURT: Why not?
"MRS. SULTZBACH: I don't believe in the death penalty.
"THE COURT: Do you have a conscious objection to the imposition of the death penalty?
"MRS. SULTZBACH: Yes, sir.
"THE COURT: And does that mean, Mrs. Sultzbach, that under no circumstances and regardless of what the evidence might show that you could vote such a penalty?
"MRS. SULTZBACH: I just couldn't.
"THE COURT: Is there any desire to question?
"MR. STOVITZ: None on behalf of the People, your Honor.
"MR. KILBRIDE: No, there is none. Thank you."
Likewise Mrs. Perez, upon being questioned by defense counsel, clearly indicated that "under no circumstances" could she render a death verdict. Although defendant urges the additional argument that the excusal of Mrs. Perez from the jury, despite her statement that she would under no circumstances vote for the death penalty, deprived "defendant of a jury composed of a cross-section of the community," this court has rejected that contention. (*In re Anderson, supra,* 69 Cal.2d 613.)

Friday, July 8, 1966, the second day of jury selection, the record discloses the following events: "(. . . members of the prospective jury [left] the courtroom and the following proceedings were had in the absence of all the prospective jurors, the Defendant and his counsel and Mr. Stovitz being present.)

"THE COURT: You are Mrs. Morris Stokes. She is a member of our jury panel. She approached me. She has a commitment for Monday. She would like to be excused from the jury. She states that she has conscientious objections to the death penalty and could not serve on this jury in any event.

"MRS. STOKES: That is right.

"THE COURT: I wonder if we might convenience her and stipulate she might be excused from the jury?

"MR. KILBRIDE [Counsel for defendant]: If she would state under no circumstances whatsoever would she vote such a penalty, I would stipulate to it.

"MRS. STOKES: I will tell you, first I thought, well, I could say the Psychiatrist, I don't care for the Psychiatrist. But definitely I don't—if I went in the jury box and go in with the thought that it would be life imprisonment, you see, I don't know.

"THE COURT: In view of the statement of Mrs. Stokes, perhaps there might be a stipulation.

"MR. STOVITZ [Deputy District Attorney]: I will stipulate that none of the other jurors are present, Mrs. Stokes is here in court; counsel is present. We will so stipulate.

"MR. KILBRIDE: Defendant joins.

"THE COURT: Thank you. You are excused."

Thus, according to the statement of the court, Mrs. Stokes asked to be excused from service on the jury because she had a "commitment for Monday" and she entertained "conscientious objections to the death penalty and could not serve on this jury in any event." Likewise, Mrs. Stokes said during the *voir dire*: "I don't care for the Psychiatrist." During the long *voir dire* involving other prospective jurors, Mrs. Stokes had heard court and counsel continually raise these three factors: (1) the situation of the prospective juror as to taking the time needed for jury duty through a trial that would last approximately three weeks; (2) the position of the venireman as to the death penalty; (3) the attitude of the prospective juror toward psychiatric testimony. Mrs. Stokes raised all three grounds to obtain her release; apparently she did not intend to serve on the jury if she could present any legitimate excuse for not so doing.

After the court had suggested that counsel might conven-

ience Mrs. Stokes by stipulating that she could be excused, defense counsel stated that he would do so if she would state "under no circumstances whatsoever would she vote" for the death penalty. To this inquiry, Mrs. Stokes replied, "I will tell you, first . . . I don't care for the Psychiatrist." Her succeeding statement as to the imposition of the death penalty was an equivocal one.

As of the time of this exchange, defense counsel knew, of course, that his entire defense rested upon psychiatric testimony for the purpose of proving defendant's diminished capacity; his success depended upon a favorable reaction of jurors to the testimony of the psychiatrists. In our view of the record, defense counsel did not reiterate his inquiry as to Mrs. Stokes's attitude on the death penalty, but, recognizing that he could not afford to accept a juror of the type of Mrs. Stokes, abandoned any objection to Mrs. Stokes's attitude on the death penalty. Instead, he acquiesced in the court's suggestion, which the prosecution likewise accepted, that there be a stipulation to excuse her.

If defendant's counsel had entertained any brief that Mrs. Stokes would qualify as a juror on the issue of the death penalty, he could have objected to the court's excusal of Mrs. Stokes. As he did not formulate or press that issue, the record itself does not pose it. We are, therefore, not here involved in a case in which a venireman was improperly excused because of her attitude on the imposition of the death penalty.

 Finally, we have examined defendant's contentions as to the misconduct of the prosecution in the penalty phase and in the *voir dire*, but we find no prejudicial error in these respects.[13]

---

[13]Whatever the impropriety of the prosecution's arguments as to "retribution" and "isolation," they do not rise to the level that they require the reversal of the penalty trial.

Defendant assigns further error in questions propounded by the prosecution of prospective jurors Rosen and Vidotto. The district attorney asked, in substance, whether Rosen realized that if defendant received a life sentence no one could change the verdict, whether he knew what happened to an accused who receives a life sentence, and whether he knew what happens to an accused who receives a death sentence. He asked Vidotto whether Vidotto understood that if defendant received the death sentence, the other sentences would be immaterial, since "the death penalty will probably be carried out first."

Although we disapprove of this line of questioning, we cannot reverse upon any such proffered ground. Defendant accepted both Vidotto and Rosen on the jury; the court terminated the inquiry of Rosen and admonished the jurors to disregard the questions and answers, and the subsequently rendered standard instruction as to this subject matter (*People v. Morse* (1964) 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R. 3d 810]) should have clarified any confusion of the jury.

The judgment is affirmed.

Traynor, C. J., McComb, J., Peters, J., Mosk, J., Burke, J., and Sullivan J. concurred.

Appellant's petition for a rehearing was denied June 25, 1969, and the opinion was modified to read as printed above.