[Crim. No. 15722. Second Dist., Div. Four. Mar. 17, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN LOUIS MOORE, Defendant and Appellant.

## Counsel

Caryl Warner, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Elizabeth Miller and Robert F. Katz, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**JEFFERSON, Acting, P. J.**—Defendant was convicted by a jury of murder in the second degree and found to be sane at the time of the commission of the crime. He appeals from the judgment.[1]

About a week prior to January 30, 1964, defendant Moore came to visit the victim Doug Carmack. The latter was not at home at the time of defendant's arrival. Leslie Ernst, a fellow tenant of the apartment house where Carmack lived, let defendant in pursuant to Carmack's instructions. Carmack had told Ernst earlier that he was expecting a visitor friend from the East named Moore. He had left a key with Ernst to let him in.

On the afternoon of January 30th Ernst was sitting by his front window when he heard a noise outside. He opened the window and looked out. Defendant was standing on the sidewalk in front of the apartment house "hollering." He was wearing only a bathrobe and a pair of undershorts. Ernst asked defendant, "What the hell are you doing out there hollering like that?" Defendant answered, "I just shot a guy." Ernst asked, "Did you shoot Carmack?" Defendant said "Yes." Ernst then asked him "What did you shoot him for?" Defendant replied "Because I didn't want to go back to the hospital." Ernst told defendant, "Get inside, get off the sidewalk." Defendant then walked back toward the apartment and out of Ernst's view. The police arrived about 10 minutes later.

[1]This case is on appeal for the second time. Defendant was originally tried and convicted in a nonjury trial of second degree murder. He appealed and his conviction was reversed in *People* v. *Moore*, 257 Cal.App.2d 740 [65 Cal.Rptr. 450].

Officer Taylor was one of the first to reach the scene. He saw defendant seated in the entranceway of the apartment house. He asked defendant what happened. Defendant said "I just shot Doug." Taylor asked "Did you kill him?" Defendant said "Yes." Shortly thereafter, defendant told another policeman, Officer Castillo, that he shot Carmack because Carmack wanted him to go back to the Veteran's Hospital. Officer McIntire, who arrived at the scene at about the same time as Officer Taylor, went into Carmack's apartment. He found Carmack unconscious with gunshot wounds in the chest and abdomen. He died a short time later.

Carmack had been lying in bed when he was shot. Four shots had been fired into the bed from the corner of the room about four feet away. Two shots struck Carmack. A .45 caliber automatic was found in the apartment. Defendant's fingerprints were on it. Outside on the floor in the hallway was a box of .45 caliber ammunition. Since a .45 caliber weapon produces considerable "kick" when fired, a person firing more than one shot would have to bring his hand back in the direction of the target with each firing. From the autopsy report a deputy medical examiner concluded that the cause of death was the two gunshot wounds. Acute alcohol intoxication was a significant contributing condition (Carmack's blood alcohol content was .33 percent), but in the medical examiner's opinion, Carmack would not have died from the amount of alcohol consumed.

Officer Robertson was with defendant when he was transported to the police station. He talked to him there later the same afternoon. Robertson observed no evidence of intoxication. Defendant was shaking and appeared distraught but was lucid and responsive to the officer's questions. He was very cooperative.

Two psychiatrists gave testimony at the guilt phase of the trial bearing on defendant's mental state at the time of the killing.

Dr. Fantl, called by the defense, testified that he gave defendant an extensive psychiatric examination on May 14, 1964, in the county jail hospital. In addition, the doctor had reviewed the records of certain mental hospitals where defendant had been committed prior to the shooting and also the records of the hospitals where he was committed from the time of the shooting until the date of the trial. Fantl diagnosed defendant as a paranoid schizophrenic. He believed defendant was acting on an impulse and was not aware of what he was doing when he shot Carmack. Defendant had complained in the past about severe abdominal pains. It was the doctor's theory that defendant, through projection (confusing oneself with another person) thought he was relieving his own unbearable stomach ache by shooting his friend Carmack in the stomach. In Fantl's opinion defendant was in a schizophrenic fugue state at the time of the shooting, and

what he did "was an automatic reaction without consideration; he was acting like a person would in a dream without any thought."

Dr. Bielinski, called by the prosecution, testified that he examined defendant on January 17, 1966, pursuant to the request of the superior court. He had also reviewed the preliminary hearing transcript and the medical records of defendant's past mental commitments. He diagnosed defendant as a chronic schizophrenic with paranoid tendencies. However, although Bielinski was of the opinion that defendant was a schizophrenic at the time he shot Carmack, he believed that defendant was "inferentially aware" of what he was doing. He believed defendant was aware he was firing bullets into the body of Carmack and that he intended to do so. Bielinski had no opinion as to whether defendant intended to kill or injure Carmack.

Defendant testified that Carmack was his friend and that he did not intend to kill him.

■ Defendant contends that the trial court erred in giving the jury a second degree felony-murder instruction based on the felony of assault with a deadly weapon.[2] The point is well taken (as the Attorney General in his brief concedes.) ■ "[A] second degree felony-murder instruction may not properly be given when it is based upon a felony which is an integral part of the homicide and which constitutes an offense included therein." (*People* v. *Ireland*, 70 Cal.2d 522, 539 [75 Cal.Rptr. 188, 450 P.2d 580].) The giving of such an instruction "has the effect of 'reliev[ing] the jury of the necessity of finding one of the elements of the crime of murder' [citation], to wit, malice aforethought." (*People* v. *Ireland, supra,* at p. 538.)

In the case at bench, as in the *Ireland* case where the defendant was also relying on the defense of diminished capacity, the court gave an instruction based upon CALJIC No. 305 (Revised). In pertinent part, the jury in the present case was instructed as follows: "Murder of the second degree is the unlawful killing of a human being with malice aforethought. In practical application this means that the unlawful killing of a human being with malice aforethought is murder of the second degree in any of the following cases: . . . ■ When the killing is a direct causal result of the perpetration or the attempt to perpetrate a felony inherently dangerous to human life, such as an assault with a deadly weapon." As was the situation in *Ireland,* the trial court followed this instruction with an in-

---

[2]Under the felony-murder rule, " 'A homicide that is a direct causal result of the commission of a felony inherently dangerous to human life (other than the six felonies enumerated in Pen. Code § 189) constitutes at least second degree murder.' [Citation.]" (*People* v. *Ireland,* 70 Cal.2d 522, 538 [75 Cal.Rptr. 188, 450 P.2d 580].)

struction on the elements of the crime of assault with a deadly weapon (based on CALJIC No. 604).

The opinion in the *Ireland* case points out that ". . . if the jury derived from the instruction [CALJIC No. 305 (Revised)] the correct meaning of the doctrine in question, it would have concluded that it should find defendant guilty of second degree murder if it found only that the homicide was committed in the perpetration of the crime of assault with a deadly weapon. This, the proper understanding of the instruction [citation], would have relieved the jury from a specific finding of malice aforethought." (At p. 539.)

The court in *Ireland* further pointed out (at p. 539, fn. 13): "In the circumstances of the instant case this interpretation would have substantially eviscerated the defense, which was based upon principles of diminished capacity. Although specific intent to commit the underlying felony is necessary to the operation of the felony-murder doctrine [citation]—so that it is arguable that a defense of diminished capacity would not be entirely unavaliable since it could be directed to the issue of intent to commit the underlying felony—nevertheless it is clear that the applicability of such evidence to that narrow issue would be in no way equivalent or comparable to the applicability of such evidence to the broad issue of malice aforethought in the charged offense. [Citation.]"

■ Here the error was compounded to an extent not found in *Ireland*. In the instruction on diminished capacity given in this case, nothing was said about that defense having any application to the crime of assault with a deadly weapon. From this, the jury could have concluded that the intent required to commit an assault with a deadly weapon would not be affected by any diminished mental capacity on the part of defendant. The upshot is that the jury could have found defendant guilty of second degree murder on the felony-murder theory although it found the defense of diminished capacity otherwise applicable. On the evidence presented, defendant had a strong case indicating diminished capacity, a much stronger case than the defendant in *Ireland*.

That the prosecution was relying heavily on the felony-murder theory, cannot be doubted. In his opening argument to the jury, the prosecutor stated that by pointing the gun and pulling the trigger defendant, "separately committed an assault with a deadly weapon . . . . If when you attempt to commit that kind of act and if as a result of that kind of assault the victim dies, we say second degree murder. . . . He (defendant) was clearly assaulting Mr. Carmack when he was shooting him . . . therefore the requirements of category three (CALJIC No. 305 Par. 3) are satisfied."

■ We find no merit in the argument of the Attorney General that

the error does not require reversal of the judgment. The error "was prejudicial per se since the defendant has suffered the denial of a jury trial on all of the issues presented by the evidence." (*People* v. *Mosher,* 1 Cal.3d 379, 390 [82 Cal.Rptr. 379, 461 P.2d 659]. See also *People* v. *Modesto,* 59 Cal.2d 722, 731 [31 Cal.Rptr. 225, 382 P.2d 33]; *People* v. *Castillo,* 70 Cal.2d 264, 270 [74 Cal.Rptr. 385, 449 P.2d 449].)

■ Although the point is not raised by defendant, we note that the court also committed reversible error in failing to give an instruction on unconsciousness as a complete defense to the charge. The testimony of Dr. Fantl was to the effect that the defendant was in a "schizophrenic fugue state" when he shot Carmack; that his acts were "an automatic reaction without consideration;" as, "in a dream without any thought." The court has the duty to instruct the jury on all of the issues of law raised by the evidence. (*People* v. *Mosher, supra,* 1 Cal.3d 379, 391; *People* v. *Wilson,* 66 Cal.2d 749, 762-763 [59 Cal.Rptr. 156, 427 P.2d 820].) "Penal Code section 26, subdivision Five, provides that 'Persons who committed the act charged without being conscious thereof' cannot be found guilty." (*People* v. *Coogler,* 71 Cal.2d 153, 169 [77 Cal.Rptr. 790, 454 P.2d 686].) The jury should have been instructed "to acquit the defendant if it found that he killed while unconscious." (*People* v. *Coogler, supra,* at p. 169; see also *People* v. *Mosher, supra,* at p. 391; *People* v. *Wilson, supra,* at pp. 761-762.)

■ We consider one additional issue that may arise on a retrial. Defendant maintains that the trial court erred in refusing to admit into evidence numerous hospital records from the mental institutions and medical facilities where he was committed. Defendant was committed at various times for extended periods from 1954 to the date of the shooting in 1964. (He was released from a mental institution in the East only 22 days before the shooting.) Thereafter, until the date of the trial in 1968, he was confined in several jail mental facilities. The medical records on defendant from these facilities were referred to in the testimony of the psychiatrists and were used by counsel in cross-examining them. The jury was instructed, however, that the information in the records could only be considered as one basis upon which the doctors formed their expert opinions, and not as substantive evidence of the truth of the matters contained therein. Defendant argued in the trial court, and now contends, that the records were admissible under the business records exception to the hearsay rule (codified in Evid. Code, § 1271).

It is well established that hospital records are business records and as

such are admissible if properly authenticated. (*People* v. *Blagg,* 267 Cal.App.2d 598, 609 [73 Cal.Rptr. 93]; Witkin Cal. Evidence (2d ed. 1966) p. 552.) The records here were admissible to show that defendant had in fact been committed to the mental institutions and, further, to show the fact that he had been diagnosed while there as mentally ill.

Concerning the diagnoses made, the Attorney General points out that the business records exception merely offers a method of proof of otherwise admissible acts, conditions or events but that it does not render admissible otherwise inadmissible opinions or conclusions. (See *People* v. *Williams,* 187 Cal.App.2d 355 [9 Cal.Rptr. 722]; Witkin Cal. Evidence (2d ed. 1966) pp. 556-557.) The records were nevertheless admissible to establish that the doctors had in fact committed him upon a diagnosis that he was mentally ill.

The other alleged errors raised by defendant are not likely to occur on any retrial and, therefore, need not be discussed.

The judgment is reversed.

Kingsley, J., and Dunn, J., concurred.