[Nos. A113027, A113369. First Dist., Div. One. Oct. 16, 2007.]

GENARO GARCIA et al., Plaintiffs and Appellants, v.
DURO DYNE CORPORATION, Defendant and Appellant.

94

**COUNSEL**

Brayton Purcell, Alan R. Brayton, Lloyd F. LeRoy and Gary L. Brayton for Plaintiffs and Appellants.

Adams|Nye|Sinunu|Bruni|Becht, Thomas A. Trapani; Walsworth, Franklin, Bevins & McCall, Robert M. Channel, Lisa R. Ackley and Dana L. Burch for Defendant and Appellant.

**OPINION**

**STEIN, J.**—Duro Dyne Corporation (Duro Dyne) and Genaro Garcia (Garcia) and his wife Delia Garcia (together, the Garcias) appeal from a judgment entered by the San Francisco Superior Court after a jury found in favor of the Garcias. Duro Dyne contends the trial court erred in (1) denying its motion for judgment notwithstanding the verdict as to the jury's award of future damages; (2) declining to offset the jury's economic damages award by settlement payments that had not yet been made; (3) declining to offset the jury's noneconomic damages award by a portion of the settlement entered into by the Garcias and one of the other defendants; and (4) miscalculating

the offset credit for noneconomic damages. The Garcias contend the trial court erred in offsetting the jury's economic damages award by $64,000 for the releases for cost waivers they entered into with 16 defendants. We reject both parties' contentions on appeal and affirm the trial court's judgment, with minor modifications as set forth below.

### FACTUAL AND PROCEDURAL BACKGROUND

The Garcias brought a personal injury and loss of consortium action against numerous defendants, including Duro Dyne, alleging that Garcia developed mesothelioma, an asbestos-caused cancer, as a result of being exposed to products containing asbestos when he worked in the sheet metal industry. The named defendants included: (1) manufacturers including Duro Dyne and Owens-Illinois, Inc. (Owens); (2) distributors including Thorpe Insulation Company (Thorpe) and Bell Industries, Inc. (Bell);[1] and (3) general contractors including Holmes and Narver, Inc. (Holmes).

The Garcias proceeded to trial against just two defendants, Duro Dyne and Holmes, after settling with Thorpe for $675,000, with Bell for $250,000, and with Owens for $25,000. The Garcias also entered into smaller settlements totaling $176,420 with seven defendants, and exchanged releases for mutual cost waivers with 16 other defendants. Garcia's mesothelioma was in remission at the time of trial, but the parties disagreed about his prognosis.

After a one-month trial, the jury returned a verdict in favor of Holmes but against Duro Dyne, awarding $1,605,619.32 to Garcia for his claims and $300,000 to his wife for her loss of consortium claim. Garcia's $1,605,619.32 award consisted of $125,369.32 in past medical expenses, $200,000 in future medical expenses, $530,250 in nonmedical economic damages and $750,000 in noneconomic damages. The jury found that Duro Dyne was strictly liable for manufacturing asbestos-containing products and negligent in failing to warn customers or recall their products. The jury found that 3 percent of the Garcias' legal "injury, damage, loss or harm" was "attributable to the negligence, fault, defective products or wrongful conduct" of Duro Dyne, and that 97 percent of such legal "injury, damage, loss or harm" was "attributable to the negligence, fault, defective products or wrongful conduct" of "all others."

Based on the finding that Duro Dyne was 3 percent liable, and in light of Civil Code section 1431.2, which provides that defendants are jointly and severally liable for economic damages, but only severally liable, i.e., in

---

[1] The parties agree that Bell was sued as successor in interest to Reliable Steel, Inc., which was a distributor of asbestos-containing products.

proportion to their degree of fault, for noneconomic damages, the trial court found that Duro Dyne was jointly and severally liable for all economic damages but liable for only $22,500 (3 percent of $750,000) of Garcia's noneconomic damages and $9,000 (3 percent of $300,000) of his wife's loss of consortium damages.

The trial court heard various posttrial motions, including Duro Dyne's motion for judgment notwithstanding the verdict as to the jury's award of future damages, which the court denied. In ruling on a motion to determine the amount by which the jury's award would be offset by the settlements entered into between the Garcias and the settling defendants, the court reduced the jury's economic damages award by the portion of the paid settlements that was attributable to economic damages. The court also allowed an offset of $4,000 per defendant for the 16 defendants with whom the Garcias exchanged releases for cost waivers, finding that the Garcias had benefited in that amount from the defendants' agreements not to seek litigation costs.

The trial court denied Duro Dyne's request to further reduce the jury's noneconomic damages award by the portion of the $250,000 settlement with Bell that was attributable to noneconomic damages. The court also denied Duro Dyne's request to reduce the jury's economic damages award by the portion of the $675,000 settlement with Thorpe and the $25,000 settlement with Owens that was attributable to economic damages, as the settlement monies remained unpaid for over six months. Counsel for the Garcias informed the court that prospects of getting paid were "dubious" because Thorpe was involved in "pre-package[d] bankruptcy" proceedings and Owens was in litigation nationwide regarding its obligations for a related company that was bankrupt. In denying Duro Dyne's request to reduce the jury's award by the unpaid settlements, the trial court commented: "I can't believe that the statute intends to give credit to a settlement that's never going to be paid. That doesn't make any sense. [¶] . . . [¶] . . . I can't, for the sake of me, think that the statute says, well, it doesn't matter as long as you had a written agreement, it doesn't matter if you ever collect it or not. [¶] One of the responsible parties gets a credit for that just because you entered into an agreement."

Duro Dyne filed a timely appeal. The Garcias cross-appealed.

Discussion

1. *The trial court did not err in denying Duro Dyne's motion for judgment notwithstanding the verdict as to the award of future damages.*

Duro Dyne claims the trial court erred in denying its motion for judgment notwithstanding the verdict as to the award of future damages because there is no substantial evidence that Garcia's mesothelioma is likely to recur. We disagree.

"Well-settled standards govern judgments notwithstanding the verdict: 'When presented with a motion for [judgment notwithstanding the verdict], the trial court cannot weigh the evidence [citation], or judge the credibility of witnesses. [Citation.] If the evidence is conflicting or if several reasonable inferences may be drawn, the motion for judgment notwithstanding the verdict should be denied. [Citations.] A motion for judgment notwithstanding the verdict of a jury may properly be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence to support the verdict. If there is any substantial evidence, or reasonable inferences to be drawn therefrom in support of the verdict, the motion should be denied. [Citation.] [Citation.] The same standard of review applies to the appellate court in reviewing the trial court's granting of the motion. [Citations.] Accordingly, the evidence . . . must be viewed in the light most favorable to the jury's verdict, resolving all conflicts and drawing all inferences in favor of that verdict.' [Citation.]" (*Osborn v. Irwin Memorial Blood Bank* (1992) 5 Cal.App.4th 234, 258–259 [7 Cal.Rptr.2d 101].)

■ Civil Code section 3283 states in part that "[d]amages may be awarded . . . for detriment . . . certain to result in the future." Courts have interpreted this section to mean that a plaintiff may recover if the detriment is "reasonably certain" to occur. (*Bihun v. AT&T Information Systems, Inc.* (1993) 13 Cal.App.4th 976, 995 [16 Cal.Rptr.2d 787] (*Bihun*), disapproved on other grounds in *Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644, 664 [25 Cal.Rptr.2d 109, 863 P.2d 179]; *Khan v. Southern Pac. Co.* (1955) 132 Cal.App.2d 410, 416 [282 P.2d 78].) It is for the jury to determine the probabilities as to whether future detriment is reasonably certain to occur in any particular case. (*Ostertag v. Bethlehem etc. Corp.* (1944) 65 Cal.App.2d 795, 805–806, 807 [151 P.2d 647] [award of future damages was supported by the evidence where an expert testified that " 'I cannot say positively what this boy's future is, but . . . I think it is reasonable to assume he is going to have trouble' " with his condition].) It is "not required" for a doctor to "testify that he [is] reasonably certain that the plaintiff would be disabled in the future. All that is required to establish future disability is that from all the

evidence, including the expert testimony, if there be any, it satisfactorily appears that such disability will occur with reasonable certainty. [Citations.]" (*Paolini v. City & County of S. F.* (1946) 72 Cal.App.2d 579, 591 [164 P.2d 916].) The fact that the amount of future damages may be difficult to measure or subject to various possible contingencies does not bar recovery. (*Bihun, supra,* at pp. 996–997.)

Here, there was ample evidence to support a finding that Garcia's mesothelioma was reasonably certain to recur and result in future economic damages. Duro Dyne correctly points out that Garcia's mesothelioma was in remission at the time of trial and that its expert, Andrew Churg, M.D., believed he was ". . . more likely than not, . . . cured of his disease." However, other experts testified that mesothelioma is not a curable disease and that Garcia's mesothelioma was not cured. Barry Horn, M.D. (Dr. Horn), a pulmonologist who testified as one of Garcia's experts, stated: "I have participated in the care of patients with mesothelioma, but this is an incurable disease. [¶] . . . [¶] No one has reported a cure of this disease." He testified that Garcia needed to be followed medically because "[h]e has big trouble coming down the pike." He also stated there was "no question" that Garcia would require future medical treatment and "surely will get chemotherapy again." On cross-examination, Dr. Horn acknowledged that he could not state with "absolute certainty" that Garcia would die of complications related to his mesothelioma, but that it was "[m]ore likely than not," or even "overwhelmingly likely" that he would. He added: "Under no circumstances can I be in a medical situation where I know something will happen with absolute certainty."

Duro Dyne also states that the jury's award of $200,000 for future expenses was speculative, as no expert could testify as to when the mesothelioma would recur. There was testimony from several experts, however, regarding the various remission periods of which they were aware, and of the average number of years an individual lived after being diagnosed with mesothelioma. Dr. Horn described the medical care costs of treating a patient with mesothelioma, including costs of ICU (intensive care unit) treatment of $4,000 to $15,000 per day, $11,500 for a single dose of chemotherapy, and estimated total future expenses of $150,000 to $200,000. Garcia's oncologist, Jack Freimann, M.D., who confirmed the likelihood that further chemotherapy would be necessary, described the costs of chemotherapy and the additional expenses involved in monitoring Garcia even before any recurrence occurred. Economist Barry Ben-Zion, Ph.D., provided the jury with a range of estimates for future damages that depended on various factors, including the possible date of recurrence and Garcia's life expectancy.

■ There is no requirement that a plaintiff prove with certainty the extent of the harm he has suffered as a result of the defendant's conduct. (*Clemente v.*

*State of California* (1985) 40 Cal.3d 202, 219 [219 Cal.Rptr. 445, 707 P.2d 818].) Although " '[i]t is desirable . . . that there be definiteness of proof of the amount of damage as far as is reasonably possible[,] [i]t is even more desirable . . . that an injured person not be deprived of substantial compensation merely because he cannot prove with complete certainty the extent of harm he has suffered.' " (*Ibid.*, quoting Rest.2d Torts, § 912, com. a, p. 479.) None of the experts could state when Garcia's mesothelioma would recur, or give a precise figure as to future damages, but there was sufficient evidence from which the jury could determine when, if ever, the mesothelioma could recur, and what the future expenses were likely to be. The trial court did not err in denying Duro Dyne's motion for judgment notwithstanding the verdict as to the jury's award of future damages.

2. *The trial court did not err in denying Duro Dyne's request to offset the jury's award by settlement monies that had not been paid.*

Code of Civil Procedure section 877[2] provides in part: "Where a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort, or to one or more other co-obligors mutually subject to contribution rights, it shall have the following effect: [¶] (a) It shall not discharge any other such party from liability unless its terms so provide, but *it shall reduce the claims against the others in the amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it whichever is the greater*." (Italics added.)

Duro Dyne contends it was entitled to an offset of the jury's award by the portion of the Thorpe and Owens settlements that were attributable to economic damages,[3] even though the settlement monies had not been paid. Duro Dyne urges us to read the term "amount stipulated by the release" to refer to the stated amount of the *settlement*, regardless of whether it has been paid. According to that argument, the jury's award would be reduced by the amounts set forth in the Thorpe and Owens settlements, which is greater than the "amount of the consideration paid" by Thorpe and Owens. The Garcias contend that the term "amount stipulated by the release" refers to the amount of *offset* stipulated by the parties to a settlement agreement, not the stated amount of the *settlement*. They argue that regardless of the meaning of that

---

[2] All further statutory references are to the Code of Civil Procedure unless otherwise stated.

[3] To determine the setoff amount, the court calculates the percentage of the award that is attributable to economic damages, then applies that percentage to the settlement amount. (*Espinoza v. Machonga* (1992) 9 Cal.App.4th 268, 273, 277 [11 Cal.Rptr.2d 498]; *Greathouse v. Amcord, Inc.* (1995) 35 Cal.App.4th 831, 839, 841 [41 Cal.Rptr.2d 561].)

phrase, awarding a nonsettling defendant an offset credit for settlement monies that have not been paid would frustrate the various public policies and objectives underlying section 877. We agree with the Garcias' assertion and conclude the trial court did not err in denying offset credits for settlement monies that had not been paid.

*Federal Sav. and Loan Ins. Corp. v. Butler* (9th Cir. 1990) 904 F.2d 505, 512 (*Butler*) addressed "[t]he meaning of the phrase 'the amount stipulated by the release . . . .' " Noting that there are numerous "amounts" that could be agreed to in the course of a settlement agreement, including the amount of the defendant's proportionate liability, or the amount of setoff, *Butler* held that the term refers to the "amount the parties have agreed can be set off against future recoveries." (*Ibid.*) It stated: "It is apparent that the statute creates two possible bases for setoff (1) the amount of the consideration paid or (2) the amount the parties agreed should be set off." (*Ibid.*) Duro Dyne argues that *Butler* is distinguishable, as the settling parties there were required to stipulate to a setoff amount only because they had agreed to a nonmonetary settlement that was difficult to value. In contrast, the settlement amounts set forth in the Thorpe and Owens releases were for cash payments totaling $700,000; thus it was unnecessary for the parties to stipulate to the amount of setoff.

■ Although we conclude that the meaning of the term "the amount stipulated by the release" is vague, and that its definition may depend on whether the settlement agreement calls for a cash payment or a nonmonetary item, we need not decide that issue in this case. We resolve the parties' dispute here by focusing on the timing of the payment of the monetary settlement, and holding that a nonsettling defendant is not entitled to an offset for such a settlement until the settlement monies have been paid.

Section 877 requires an offset in the greater of the "amount stipulated by the release" or the "amount of the consideration paid," but does not specify when the defendant is entitled to receive the offset credit. As seen in several orders of which we took judicial notice, trial courts have awarded nonsettling defendants offset credits only for settlement monies the plaintiffs have actually *received*, and have retained jurisdiction to award future credits in the event future settlement payments are made. (See also *Cadlo v. Metalclad Insulation Corp.* (2007) 151 Cal.App.4th 1311, 1318 [61 Cal.Rptr.3d 104] [trial court retained " 'continuing jurisdiction to ensure defendants receive [an] . . . offset from any future settlement monies received in satisfaction of this . . . action' "].) Further, in one case dealing with a monetary settlement that had not been satisfied at the time of judgment, the trial court denied an offset for the unpaid settlement but invited the nonsettling defendant to make an ex parte application for postjudgment setoffs "at such time as the

settlement was actually paid." (*Fortman v. Hemco, Inc.* (1989) 211 Cal.App.3d 241, 264 [259 Cal.Rptr. 311].) The Court of Appeal affirmed the trial court's order, holding it had "acted within its discretion in making this order . . . ." (*Ibid.*) Similarly, we believe the trial court properly denied Duro Dyne's request for an offset credit for the Thorpe and Owens settlements that had not been paid. We hold, however, that the judgment shall be amended to include a reservation of jurisdiction for the trial court to calculate and award offset credits to Duro Dyne for any future settlement payments that are made to the Garcias by Thorpe or Owens.[4]

■ Our conclusion is consistent with several public policies strongly reflected in the law, including section 877's objectives of equitably sharing costs among the parties at fault and encouraging settlement. (See *Abbott Ford, Inc. v. Superior Court* (1987) 43 Cal.3d 858, 872–873 [239 Cal.Rptr. 626, 741 P.2d 124].) It is also consistent with the principle that "[a] court considering the amount of credit or setoff to be accorded a nonsettling defendant . . . must take into account . . . another important public policy: ' "the maximization of recovery to the plaintiff for the amount of . . . injury to the extent that negligence or fault of others has contributed to it." [Citation.]' " (*Franklin Mint Co. v. Superior Court* (2005) 130 Cal.App.4th 1550, 1556–1557 [31 Cal.Rptr.3d 319].)

To allow a nonsettling defendant who proceeded to trial and was found liable to reduce the award against it in the amount of a settlement that has not yet been paid would deprive the injured plaintiff of an award to which he or she is presently entitled, and penalize the plaintiff for having settled the claims against some of the defendants. Such a result would frustrate the policy of splitting an award of damages among the parties at fault by placing the burden of an unpaid settlement on the innocent plaintiff.

Duro Dyne is not without a remedy, as it will be entitled to an offset if and when Thorpe or Owens makes any payments to the Garcias. Even if Thorpe or Owens becomes insolvent, as the Garcias suggested they may, our result would be in line with cases that have held that if one or more tortfeasors become insolvent and are not able to bear their fair share of the loss, the shortfall created by such insolvency is to be apportioned equitably among the *remaining culpable parties*, which, in this case, would be the liable defendants, including Duro Dyne, not the Garcias. (E.g., *Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1198 [246 Cal.Rptr. 629, 753 P.2d 585]; *Paradise Valley Hospital v. Schlossman* (1983) 143 Cal.App.3d 87, 89 [191 Cal.Rptr. 531].) The trial court did not err in denying offset credits for settlement monies that had not been paid. With the exception of amending the

---

[4] The Garcias state that they "do not dispute, and never have disputed the propriety of a credit for [the Thorpe and Owens] settlements if they are paid."

judgment to allow Duro Dyne to return to the trial court in the event Thorpe or Owens makes any settlement payments to the Garcias, we affirm the order denying Duro Dyne's request for offset credits.

3. *The trial court did not err in declining to further offset the jury's noneconomic damages award by the Garcias' settlement with Bell.*

■ Civil Code section 1431.2, subdivision (a), known as Proposition 51, provides: "In any action for personal injury, property damage, or wrongful death, based upon principles of comparative fault, the liability of each defendant for non-economic damages shall be several only and shall not be joint. Each defendant shall be liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault, and a separate judgment shall be rendered against that defendant for that amount." Thus, in an action subject to Proposition 51, each tortfeasor remains jointly and severally liable to the plaintiff for economic damages, but is liable to the plaintiff for only its proportionate share of noneconomic damages. (*DaFonte v. Up-Right, Inc.* (1992) 2 Cal.4th 593, 600 [7 Cal.Rptr.2d 238, 828 P.2d 140].) Because each tortfeasor is only severally liable for its share of noneconomic damages, a nonsettling defendant is not entitled to an offset credit under section 877 for the portion of any settlement that is attributable to noneconomic damages. (*Hoch v. Allied Signal, Inc.* (1994) 24 Cal.App.4th 48, 63, 64 [29 Cal.Rptr.2d 615].)

There is a split in authority regarding whether Proposition 51 applies to strict products liability cases,[5] but the parties do not dispute that the trial court properly applied it to (1) reduce the economic damages award by the portion of the paid settlements that were attributable to economic damages; and (2) reduce the noneconomic damages award by 97 percent to reflect the jury's finding that Duro Dyne was only 3 percent responsible for the Garcias' injuries. Duro Dyne, however, asserts the trial court should have further reduced the 3 percent by the portion of the settlement between the Garcias

---

[5] *Wimberly v. Derby Cycle Corp.* (1997) 56 Cal.App.4th 618, 633 [65 Cal.Rptr.2d 532], and more recently, *Bostick v. Flex Equipment Co., Inc.* (2007) 147 Cal.App.4th 80, 93 [54 Cal.Rptr.3d 28], held that Proposition 51 does not apply to strict liability cases because Proposition 51 did not modify the common law rule that defendants in the chain of distribution of a single defective product are jointly and severally liable for all damages, economic and noneconomic. *Arena v. Owens-Corning Fiberglas Corp.* (1998) 63 Cal.App.4th 1178, 1197–1198 [74 Cal.Rptr.2d 580] (*Arena*) held that Proposition 51 applies to strict liability asbestos cases under certain circumstances. *Wilson v. John Crane, Inc.* (2000) 81 Cal.App.4th 847, 858 [97 Cal.Rptr.2d 240] agreed with *Arena* but held more generally that Proposition 51 applies to all strict liability cases, stating there is "no reason to believe that the voters thought that [the perceived evil to be eliminated by Proposition 51] was any less or different when the defendant was a manufacturer strictly liable for a defective product . . . ." (See also *Hackett v. John Crane, Inc.* (2002) 98 Cal.App.4th 1233, 1239 [120 Cal.Rptr.2d 662] [applying Prop. 51 to strict liability asbestos case].)

and Bell (the Bell settlement) that was attributable to noneconomic damages because Duro Dyne and Bell were in the same chain of distribution[6] and were therefore jointly and severally liable for all damages, including noneconomic damages, caused by their product.

Duro Dyne relies on *Arena, supra,* 63 Cal.App.4th at page 1197, which held that where the evidence provides a basis to allocate liability for noneconomic damages among multiple defective products, all defendants in the chain of distribution for each product will be jointly and severally liable for all damages attributable to that product. *Arena,* however, does not apply in this case because the evidence does not show the percentage of harm caused by any specific product manufactured by Duro Dyne.

Duro Dyne asserts that because "the jury decided that three percent (3%) of the [Garcias'] injuries resulted from MR. GARCIA's exposure to DURO DYNE's asbestos-containing products," all defendants in the chain of distribution of Duro Dyne's products are jointly and severally liable for 3 percent of the damages. The jury, however, was presented with the following question: "Assuming that 100% represents the total fault for the plaintiffs' injury, damage, loss or harm, what percentage of this 100% is attributable to *the negligence, fault, defective products, or wrongful conduct . . .* of [Duro Dyne]?" (Italics added.) The jury responded, "3%." The question focused on the percentage of fault attributable to a particular *defendant,* i.e., Duro Dyne, not on the percentage of fault attributable to a specific *product* manufactured by Duro Dyne. The distinction is significant in this case for the following reasons.

First, the jury found that Duro Dyne was both negligent and strictly liable. Thus, the jury's 3 percent determination reflected Duro Dyne's total percentage of fault, including negligence-based fault. Because the jury was not asked to allocate its 3 percent finding between strict liability and negligence, we cannot determine the extent to which the jury's 3 percent finding was based on Duro Dyne's defective products, as opposed to its negligent acts. Without such a determination, we also cannot determine the amount of harm for which the defendants in the chain of distribution of those products should share joint and several liability.

Second, the evidence shows that Duro Dyne manufactured more than one asbestos-containing product that contributed to Garcia's injuries. However, because Duro Dyne did not ask the jury to allocate its 3 percent finding between the different products it manufactured, we cannot determine the

---

[6] There appears to be no substantial evidence supporting the trial court's finding that Duro Dyne and Bell were in the same chain of distribution. However, we need not address this issue, because we hold for other reasons that Duro Dyne is not entitled to the offset it seeks.

amount of harm caused by any specific Duro Dyne product of which Bell was in the chain of distribution.[7] Thus, Bell cannot be held jointly and severally liable under *Arena, supra,* 63 Cal.App.4th 1178 for the entire noneconomic damages attributable to Duro Dyne's 3 percent liability.

Finally, there was evidence that the flexible duct connector, one of the asbestos-containing products that Duro Dyne manufactured, was also being manufactured by various other companies at the time Garcia was exposed to it. Garcia testified he came into contact with flexible duct connectors that were manufactured by Duro Dyne, Owens, Vent Fabrics, K Manufacturing and American Elgin. Duro Dyne's general manager testified that Vent Fabrics was a strong competitor in manufacturing flexible duct connectors. Duro Dyne does not dispute that there were other manufacturers of the product, and does not assert that its flexible duct connector was a distinct product from those manufactured by other companies. Because there were multiple manufacturers of the flexible duct connectors that contributed to Garcia's injuries, the total percentage of harm caused by the *flexible duct connector*—in contrast to the harm caused *by Duro Dyne*—presumably well exceeded the 3 percent of harm the jury assigned to Duro Dyne.

Because the evidence does not provide a basis for us to determine the amount of harm caused by any specific product of which Bell was in the chain of distribution, the trial court did not err in refusing to apply *Arena, supra,* 63 Cal.App.4th 1178 to further reduce the 3 percent noneconomic damages award by the portion of the Bell settlement attributable to noneconomic damages.

4. *The judgment shall be amended to reflect the correct offset figure for the economic damages award.*

Duro Dyne contends, and the Garcias agree, that the trial court made certain errors in calculating the amount by which the economic damages award would be offset.[8] The judgment shall be amended to reflect the correct setoff figure for the economic damages award.

---

[7] The trial court's finding that Duro Dyne and Bell were in the same chain of distribution also did not specify the product of which they were in the same chain of distribution.

[8] Specifically, the parties agree that the correct ratio of economic damages to total damages is 53.3 percent, and that because the cost-waiver releases did not cover potential future wrongful death actions, no portion of the $64,000 offset credit for the cost-waiver releases should have been allocated to the wrongful death cause of action. Based on the parties' agreement regarding these calculation errors, the correct offset credit that Duro Dyne should receive against the economic damages award is $189,320.09.

5. *The trial court did not err in offsetting the economic damages award by $64,000 for the releases for cost waivers entered into by the Garcias and 16 defendants.*

The Garcias' sole contention in their appeal is that the trial court erred in offsetting their economic damages award by $64,000 for the cost-waiver releases they entered into with 16 defendants ($4,000 offset per defendant for each of the 16 defendants). The Garcias assert that the cost-waiver releases were worth nothing, or at most, were worth the actual costs incurred by each of the 16 defendants, which were much less than $4,000 per defendant. We affirm the trial court's order.

In *Armstrong World Industries, Inc. v. Superior Court* (1989) 215 Cal.App.3d 951 [264 Cal.Rptr. 39] (*Armstrong*), the prevailing defendant was awarded $15,000 in litigation costs but agreed not to collect the $15,000, in exchange for the plaintiff's agreement not to appeal the judgment. (*Id.* at p. 954.) *Armstrong* held that the defendant's forbearance from seeking an award to which it was entitled was legal consideration for a contract and was equivalent to the plaintiff receiving $15,000. (*Id.* at p. 958.) *Armstrong* is distinguishable because there, the defendant had prevailed at trial and had a right to its litigation costs, whereas here, the 16 cost-waiver defendants did not proceed to trial and were not prevailing parties.

■  However, the principles set forth in *Armstrong, supra*, 215 Cal.App.3d 951, apply to the present case. It was undisputed that the 16 cost-waiver defendants would have prevailed had they gone to trial. At least one of the defendants had prevailed on its motion for summary judgment, and the Garcias themselves state: "There is nothing that suggests [the cost-waiver defendants] were anything other than erroneously or improvidently joined parties who bore no fault and against whom neither plaintiff nor any non-settling defendant had any provable claim." The trial court found that "Plaintiffs' agreement to give up their right to seek[] costs has no value because Plaintiffs have no right to seek costs under Cal. Civ. Proc., § 1032. Therefore, the cost waiver settlements have the value of the settling defendant's costs incurred up to that point, and DURO DYNE CORPORATION is entitled to an offset for that value." Implicit in the trial court's finding was that the cost-waiver defendants would have prevailed had they proceeded to trial, and therefore gave up the right to litigation costs to which they would have been entitled as prevailing parties. We hold that where, as here, it is undisputed that the defendants settling for cost waivers would have prevailed had they proceeded to trial, the cost-waiver releases have offset value.

■  The Garcias assert the cost-waiver releases have no offset value because the statutory purpose of section 877 is to allocate costs among *joint*

*tortfeasors*, and an offset credit is therefore inappropriate where, as here, the cost-waiver defendants are "erroneously or improvidently joined" or are clearly not at fault. Section 877, however, provides that an offset credit is required for settlements entered into by "tortfeasors *claimed to be liable* for the same tort . . . ." (Italics added.) Thus, the plain language of the section requires an offset credit so long as the settling defendant is an "alleged tortfeasor." (See *Poire v. C.L. Peck/Jones Brothers Construction Corp.* (1995) 39 Cal.App.4th 1832, 1840 [46 Cal.Rptr.2d 631]; *Knox v. County of Los Angeles* (1980) 109 Cal.App.3d 825, 833 [167 Cal.Rptr. 463].) Because the Garcias' complaint alleged that the cost-waiver defendants were tortfeasors, the subsequent determination that they were not liable did not deem their settlements valueless for purposes of providing Duro Dyne with an offset credit under section 877.

■ The trial court also properly placed the burden of establishing the value of the cost-waiver releases on plaintiffs and did not err in determining that the Garcias had not met their burden. (*Arbuthnot v. Relocation Realty Service Corp.* (1991) 227 Cal.App.3d 682, 690 [278 Cal.Rptr. 135] [the court shall place the burden of establishing the value of the settlement agreement on the settling parties, who are in a better position to do so than the nonsettling defendant].) After making clear its belief that the cost-waiver releases had offset value, the trial court asked for a valuation of the releases, noting that it was plaintiffs' burden to produce that information. In response, Duro Dyne submitted a declaration, a copy of the docket showing the various filing fees incurred by some of the cost-waiver defendants, and copies of deposition transcripts showing that many of them attended the depositions and had presumably purchased at least portions of the deposition transcripts. Duro Dyne stated that the value of each cost-waiver release was "at least $6,000." The Garcias submitted a declaration asserting the cost-waiver releases had no value.

The appropriate test is whether the trial court abused its discretion in valuing the cost-waiver releases at $4,000 per release, that is, whether its decision "exceeded the bounds of reason. [Citation]." (*Anastos v. Lee* (2004) 118 Cal.App.4th 1314, 1318–1319 [13 Cal.Rptr.3d 716].) Given that the burden was on the Garcias to produce evidence to assist the court in valuing the cost-waiver releases, and that Duro Dyne had presented some evidence showing that each cost-waiver defendant had incurred approximately $6,000 in costs, the trial court acted within its discretion in finding that each cost-waiver release had a value of $4,000. The Garcias, for the first time on appeal, set forth various facts in support of their argument that the actual costs were much less than $4,000 per defendant. Because the Garcias did not present these arguments to the trial court, we will not consider them for the first time on appeal. (See *Martinez v. Scott Specialty Gases, Inc.* (2000) 83 Cal.App.4th 1236, 1249 [100 Cal.Rptr.2d 403] [points not asserted below or

considered by the trial court are deemed waived and will not be considered for the first time on appeal].) The trial court did not err in awarding Duro Dyne a $64,000 offset credit for the releases for cost waivers entered into by the Garcias and 16 defendants.

## DISPOSITION

The judgment shall be amended to include a reservation of jurisdiction to award further offset credits to Duro Dyne in the event any portion of the Thorpe or Owens settlements is paid, and to reflect the correct setoff figure for the economic damages award. In all other respects, the judgment is affirmed. The parties shall bear their own costs on appeal.

Marchiano, P. J., and Margulies, J., concurred.