Filed 7/25/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| JOSHUA DAVID,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DAVID HERNANDEZ et al.,<br><br>    Defendants and Appellants. | 2d Civil No. B270133<br>(Super. Ct. No. 56-2011-00391849-CU-PA-VTA)<br>(Ventura County) |

      David Hernandez and D & H Trucking appeal from a $3.3 million personal injury judgment entered against them.[1] Appellant's truck was involved in a collision with a minivan driven by respondent Joshua David, who sustained serious physical injuries.

      This is the second appeal in this matter. In the first appeal, we reversed a judgment entered in appellant's favor after

---

[1] Hernandez is doing business as D & H Trucking. We consider Hernandez to be the sole appellant. All future references to appellant are to Hernandez personally. (See *Providence Washington Ins. Co. v. Valley Forge Ins. Co.* (1996) 42 Cal.App.4th 1194, 1200.)

a jury trial.  (*David v. Hernandez* (2014) 226 Cal.App.4th 578, 592.)

On retrial, the jury found that it is reasonably certain respondent will need four future shoulder surgeries.  Appellant concedes that one future shoulder surgery is reasonably certain.  He contends that the evidence is insufficient to support the need for three subsequent shoulder surgeries.  He also contends that the trial court erroneously excluded expert testimony that respondent's ability to drive was impaired by marijuana use.  We affirm.

*Facts*

Appellant is a truck driver.  At the time of the collision in June 2010, he was driving a tractor that was hauling a flatbed trailer.  The trailer was 45 feet long.  It was carrying a load of cement that weighed approximately 45,000 pounds.

While traveling northbound on Pacific Coast Highway, appellant drove across the southbound lane and pulled into a parking area next to that lane.  The tractor-trailer was facing north against oncoming southbound traffic.  Appellant parked and took a nap.  When he awoke, it was getting dark.  He decided to continue northbound on Pacific Coast Highway.  Appellant turned on his lights, drove across the southbound lane, and turned left into the northbound lane.

Respondent was driving a minivan southbound on Pacific Coast Highway.  The left front of the minivan crashed into the middle of the left side of the flatbed trailer.  "The point of impact was squarely in the southbound lane."  At the time of impact, appellant's truck was traveling at about 10 to 15 miles per hour.  The minivan was traveling at about 45 miles per hour.

2

Respondent remembered nothing about the collision. Natalie Pierson was in the front passenger seat of the minivan. She saw the tractor's headlights in the northbound lane. She then "saw [respondent's] eyes go big." She looked forward and saw "a dark object that was right in front of [her]" in the southbound lane. The dark object was the left side of the flatbed trailer. In her "peripheral vision," Pierson saw respondent "turn the wheel to the right." The next thing that happened was "the crash."

Respondent "was trapped in the driver's seat." It took about 45 minutes to extricate him from the vehicle. His injuries included "an open fracture in his [left] shoulder. . . . [T]he bone was protruding through the skin."

*Jury Verdict*

On retrial the jury found that appellant was negligent and that his negligence was a substantial factor in causing respondent's injuries. It also found that respondent was negligent but that his negligence was not a substantial factor in causing his injuries. It awarded respondent damages of $3,317,580. The damages include future medical expenses for four shoulder surgeries at a cost of $161,750 per surgery.

*Respondent's Motion in Limine to Exclude Expert Testimony*

At the first trial the court excluded evidence of respondent's marijuana use. At the retrial appellant again sought to present expert testimony to show that, at the time of the collision, respondent's ability to drive was impaired by his consumption of marijuana. Appellant's expert witness was Dr. Marvin Pietruszka.

Respondent filed a pretrial motion in limine to exclude Dr. Pietruszka's testimony. No live testimony was

presented at the hearing on the motion. The parties presented written materials. A "physician progress note" shows that, immediately after the collision, respondent told an emergency-room physician that he had "occasional[ly]" used marijuana but had not consumed it within the past 36 hours.

A urine sample was collected from respondent in the emergency room. A urine drug screen was positive for THC (tetrahydrocannabinol). THC is "the psychoactive ingredient" in marijuana. (*People v. Bergen* (2008) 166 Cal.App.4th 161, 164.) There are two types of THC - active (also known as hydroxy THC) and inactive (also known as carboxy THC). During oral argument at the hearing on the motion in limine, respondent's counsel explained to the trial court: "An active metabolite means that the ingredients are there that can potentially make a person impaired. If it's an inactive metabolite, that means it's still there in the fatty tissue, but it's not doing anything to anybody." Appellant did not dispute counsel's explanation.[2]

---

[2] See *People v. Derror* (2006) 475 Mich. 316, 321-322 [715 N.W.2d 822, 826], overruled on other grounds in *People v. Feezel* (2010) 486 Mich. 184, 188 [783 N.W.2d 67, 71]: "The experts agreed that carboxy THC [inactive THC] is a 'metabolite,' or byproduct of metabolism, created in the human body during the body's biological process of converting marijuana into a water-soluble form that can be excreted more easily. Its presence in the blood conclusively proves that a person ingested THC at some point in time. However, carboxy THC itself has no pharmacological effect on the body and its level in the blood correlates poorly, if at all, to an individual's level of THC-related impairment. In fact, carboxy THC could remain in the blood long after all THC has gone, as THC quickly leaves the blood and enters the body's tissues. [Citation.]"

4

Respondent's test result does not show the concentration of THC in his urine or the extent to which the THC is active or inactive. To test positive, the THC concentration had to be at least "50 NG/ML" - 50 nanograms per milliliter. The Laboratory Report states: "This urine drug screen provides only a preliminary test result. These results are to be used for medical purposes only. [¶] A more specific alternate chemical method must be used in order to obtain a confirmed analytical result."[3]

Dr. Pietruszka's Proposed Trial Testimony

Dr. Pietruszka's proposed trial testimony, as set forth in his deposition, was as follows: In the emergency room after the collision, respondent had "very high blood pressure," a "rapid pulse," and a "rapid respiratory rate." These symptoms, as well as his "loss of memory," are consistent with being under the influence of marijuana. But stress and traumatic injuries can cause the same symptoms. "Obviously stress plays a role. He was under stress . . . because of the accident."

Based on the urine drug screen test result, "[w]e know that [respondent] had at least 50" nanograms of THC per milliliter of urine. But "in most . . . of the positives [positive tests] that [Dr. Pietruszka has] seen, . . . you can easily find 100 nanograms [of THC per milliliter]."

The "active component" of THC "is still found 36 hours later in urine samples" and "could be found up to 48 hours

_____

[3] In argument before this court, appellant conceded that, based on the type of preliminary urine drug screen test administered to respondent, no California case has permitted an expert to opine that a driver was under the influence of marijuana.

5

later."  "The literature suggests that . . . [t]here should have been a small amount of active metabolite in [respondent's] urine."  But the amount of active metabolite "wasn't measured."  "[T]he literature supports that there is an effect even 36 hours later, and that effect can translate into a negative effect on driving performance, increased risk of accidents, visual difficulties, a delayed . . . response braking, and that type of response, reaction time.  And that would lead to a motor vehicle accident."

Dr. Pietruszka continued:  "[T]he fact that I believe that [respondent] had active THC . . . in his system . . . , the fact that he was in an accident, the fact that he's got tachycardia [rapid pulse], that he's got high blood pressure, the fact that his respiratory rate is high, he's got amnesia, he's got all these symptoms, his visibility could have been reasonably [a]ffected by . . . the use of THC, his reaction time could be slowed by a drug that reduces reaction time, his attention is decreased, I believe to a reasonable degree of medical certainty, yes, he was under the influence [of marijuana]."

Declaration of Dr. McGee

Respondent's expert, Dr. Terence McGee, declared that, based on the urine drug screen test result, "it [cannot] be determined if the THC [in respondent's urine] is active or inactive."

Declaration of Dr. Tinsley

Dr. Robeson Tinsley is an emergency-room physician who treated respondent immediately after the collision.  Dr. Tinsley declared:  "[B]ased upon my training, expertise and experience, I am aware that THC can be captured in a patient's urine for weeks after use."  Respondent "showed no evidence of

intoxication."  "I believed within a likely degree of medical certainty that the patient was not impaired in any way."

<u>Trial Court's Ruling</u>

The trial court stated:  "I don't think there's adequate foundation for the conclusions that the defense wants to put on here.  So I will grant the motion in limine."  The court reasoned:  "[W]e have a problem with what is only a preliminary test and then we have the problem with no foundation to show a connection between the test result . . . and any impairment.  And it appears that [appellant's] expert would be reasoning backward from the fact that something untoward happened; therefore, somebody must have been impaired."

*Exclusion of Expert Testimony*

"'Evidence Code section 801, subdivision (b), states that a court must determine whether the matter that the expert relies on is of a type that an expert reasonably can rely on "in forming an opinion *upon the subject to which his testimony relates*." . . . We construe this to mean that the matter relied on must provide a reasonable basis for the particular opinion offered, and that an expert opinion based on speculation or conjecture is inadmissible.' [Citation.]" (*Sargon Enterprises*, *Inc. v. University of Southern Cal.* (2012) 55 Cal.4th 747, 770 (*Sargon*).)  "Thus, under Evidence Code section 801, the trial court acts as a gatekeeper to exclude speculative or irrelevant expert opinion." (*Ibid*.)  "'A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.' [Citation.]" (*Id*. at p. 771.)

"A trial court exercises discretion when ruling on the admissibility of expert testimony under Evidence Code section 801, subdivision (b).  If [as here] the court excludes expert

7

testimony on the ground that there is no reasonable basis for the opinion, we review the exclusion of evidence under the abuse of discretion standard. [Citations.]" (*In re Lockheed Litigation Cases* (2004) 115 Cal.App.4th 558, 564.) "The trial court has broad discretion in deciding whether to admit or exclude expert testimony [citation] . . . ." (*People v. McDowell* (2012) 54 Cal.4th 395, 426.) "A ruling that constitutes an abuse of discretion has been described as one that is 'so irrational or arbitrary that no reasonable person could agree with it.' [Citation.]" (*Sargon, supra*, 55 Cal.4th at p. 773.)

"The trial court properly acted as a gatekeeper to exclude speculative expert testimony. Its ruling came within its discretion." (*Sargon, supra*, 55 Cal.4th at p. 781.) It is a matter of speculation whether respondent was under the influence of marijuana at the time of the collision. Dr. Pietruszka testified that the "active component" of THC "is still found 36 hours later in urine samples" and "could be found up to 48 hours later." But there is no evidence that respondent used marijuana within 48 hours before he gave the urine sample. Respondent told an emergency-room physician that he had *not* used marijuana within the past 36 hours. He did not say when he had last used it. According to Dr. Tinsley, "THC can be captured in a patient's urine for weeks after use."

Dr. Pietruszka opined that, at the time of the collision, respondent had active THC in his system. Appellant argues that Dr. Pietruszka's opinion is supported by a medical textbook, *Marijuana and the Cannabinoids*, edited by Mahmoud ElSohly, Ph.D. Appellant asserts: "That book contains data showing that when a urine test uses a threshold of 50 ng/ml of THC - like the test performed on [respondent] - a positive result

8

indicates that both the inactive and active forms of THC are present. A chart in the book shows that for every patient who had a measurement of 50 ng/ml of the inactive metabolite . . . , that patient also had some amount of the active metabolite . . . ." "[This] data disproves [respondent's] argument that he could test positive for metabolites in excess of 50 ng/ml and have only the inactive form of THC in his system."

The chart shows the relative concentrations of THC-COOH (inactive THC) and 11-OH-THC (active THC) in the urine of persons who tested positive for cannabis. Persons with approximately 50 ng/ml of inactive THC also had some amount of active THC in their urine. The chart does not indicate when the tested persons last used marijuana. They may have used it within 36 hours before the test. The chart, therefore, does not prove that respondent had active THC in his system. Respondent denied using marijuana within 36 hours before the test.

Even if respondent's urine contained active THC, it is speculative whether the amount was sufficient to impair his ability to drive a motor vehicle. Dr. Pietruszka testified that the "amount of active metabolite" in respondent's urine "wasn't measured."

Moreover, the symptoms of marijuana use displayed by respondent - high blood pressure, rapid pulse, rapid respiratory rate, and memory loss - could have been caused by stress and respondent's traumatic injuries. Dr. Tinsley, who examined respondent in the emergency room after the collision, declared that he had "showed no evidence of intoxication."

Appellant faults the trial court for granting respondent's motion in limine "without conducting an evidentiary hearing under Evidence Code section 402 to examine the

9

scientific and medical support for Dr. Pietruszka's opinions." The court cannot be faulted because appellant never requested an evidentiary hearing under section 402. (See *Doers v. Golden Gate Bridge, Highway & Transp. Dist.* (1979) 23 Cal.3d 180, 184-185, fn. 1; *In re Marriage of Falcone* (2008) 164 Cal.App.4th 814, 826.)

*Future Medical Expenses*

The jury awarded respondent medical expenses for four future shoulder surgeries at a cost of $161,750 per surgery. Appellant argues, "[T]he testimony of [respondent's] treating physician [Dr. Norris] established that only one future shoulder surgery is reasonably certain." Thus, appellant asks us to reduce the award for future medical expenses by $485,250.

Testimony of Dr. Norris

Dr. Tom Norris testified as follows: He operated on respondent for the first time in 2011. Respondent's left "humeral head had collapsed down to a pancake" because of an infection and lack of blood supply. (The humeral head is the ball part of the ball-and-socket shoulder joint.) Respondent "didn't have a ball and a socket, he had just two flat plates essentially rubbing together." Dr. Norris removed the "necrotic humeral head" ("[n]ecrosis is something that has died") and replaced it with a prosthesis. The stem of the prosthesis is titanium and the ball is cobalt chrome. The stem "goes down part way" into the humerus (the bone that runs from the shoulder to the elbow) and is fixed in place with cement. The cobalt-chrome ball is attached to the socket part of the shoulder joint.

Dr. Norris continued: Over time, the rubbing of the metal ball against the socket will wear away the socket. According to "published research [that] follows humeral head replacements over a 15-year period," the ball "will actually shift

10

into the shoulder blade about half a millimeter to a millimeter a year." "At some point, [respondent] may need a cover for the socket or to replace this kind of prosthesis with what is called a 'reverse shoulder prosthesis.' That would depend upon infection, rotator cuff status, how much bone is worn away, whether or not he needs bone grafts." It is best to wait as long as possible before performing surgery on the shoulder socket "because once he has something done to the socket, that stuff can wear out in 10 or 15 years and then it needs to be redone. . . . One needs bone grafts . . . to try to build the bone back." "Given that he was 19 when [the prosthesis] was put in and that [the socket] will wear, its [*sic*] probably an 80 to 90 percent chance that he will have additional surgery going forward."

Dr. Norris did not say when the 80 to 90 percent certain shoulder surgery is likely to occur. Nor did he say how many revision surgeries, if any, respondent will need.

Testimony of Dr. Tauber

Dr. Jacob Tauber, an orthopedic surgeon, testified as an expert for appellant. Dr. Tauber noted that Dr. Norris had performed a partial shoulder replacement on respondent - "[t]he type of shoulder replacement . . . where you've replaced one side [i.e., the ball] of the [ball-and-socket] joint." "Because the shoulder is a non-weight-bearing joint," Dr. Tauber expected "to a reasonable degree of medical certainty" that the partial shoulder replacement would "last . . . if [respondent] acts prudently and takes care of it." It "could last him his lifetime if he protects it. If he doesn't protect it, that's a different issue." Dr. Tauber disagreed with studies "suggesting that whether he does [protect it] or he doesn't, the shoulder is going to wear out at anywhere from one to two millimeters a year until it gets to the point where

11

[respondent is] going to need a full shoulder replacement [i.e., replacement of both sides of the ball-and-socket joint]."[4] The studies are not "universally accepted."

Dr. Tauber read Dr. Norris's deposition. Respondent's counsel asked, "Dr. Norris is suggesting that [respondent] is going to have a full shoulder replacement by the year 2031, isn't he?" Dr. Tauber replied: "I didn't remember the year, but that's what he suggested. I knew that he was recommending that or that he opined that he would need a full replacement." Counsel asked, "And then several revisions after that?" Dr. Tauber responded, "That's what he opined."

<u>Testimony of Edward Bennett</u>

Edward Bennett testified that he is a "certified life care planner expert." He prepared a life care plan report for respondent. It covers "future life care costs," including "costs of surgeries." The number of future shoulder surgeries is based on Dr. Norris's statements. The report was not admitted in evidence and is not included in the record on appeal.

<u>Testimony of John Nordstrand</u>

John Nordstrand, respondent's forensic economist, testified that the life care plan report prepared by Bennett includes a shoulder "arthroplasty" surgery at age 31 and three subsequent shoulder "revision" surgeries. An arthroplasty is a joint replacement. Thus, the total number of future shoulder surgeries is four. Bennett estimated that the cost of each surgery would be $161,750.

---

[4] According to Dr. Norris, studies suggest that the shoulder will wear out at a rate of one-half to one millimeter, not one to two millimeters, per year.

12

*Sufficiency of the Evidence to Support*
*Four Future Shoulder Surgeries*

Civil Code section 3283 provides, "Damages may be awarded . . . for detriment . . . certain to result in the future." "Courts have interpreted this section to mean that a plaintiff may recover if the detriment is 'reasonably certain' to occur. [Citations.] It is for the jury to determine the probabilities as to whether future detriment is reasonably certain to occur in any particular case. [Citation.]" (*Garcia v. Duro Dyne Corp.* (2007) 156 Cal.App.4th 92, 97 (*Garcia*); see also *Ostertag v. Bethlehem Shipbuilding Corp.* (1944) 65 Cal.App.2d 795, 807 ["from expert testimony as to the medical probabilities it is for the jury to determine whether future detriment is reasonably certain to occur"].)

"A challenge in an appellate court to the sufficiency of the evidence is reviewed under the substantial evidence rule. [Citations.] . . . ""[T]he power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the findings below. [Citation.] We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor . . . ." [Citation.]' [Citations.]" (*Lenk v. Total-Western, Inc.* (2001) 89 Cal.App.4th 959, 968.) Substantial evidence is "evidence which is reasonable, credible, and of solid value . . . such that some reasonable trier of fact could find that the judgment and each essential element thereof was established by the appropriate burden of proof." (*Rivard v. Board of Pension Commissioners* (1985) 164 Cal.App.3d 405, 414 (*Rivard*).) The

appropriate burden of proof here is proof of reasonable certainty by a preponderance of the evidence.  (Evid. Code, § 115.)

Dr. Norris's testimony constitutes substantial evidence of reasonable certainty that respondent will undergo one future shoulder surgery (the first surgery) at an undetermined time.  Dr. Norris opined, "Given that he was 19 when [the prosthesis] was put in and that [the socket] will wear, its [*sic*] probably an 80 to 90 percent chance that he will have additional surgery going forward."

Dr. Norris's testimony does not constitute substantial evidence that, after the first surgery, it is reasonably certain respondent will require three additional surgeries at 15-year intervals for a total of four future shoulder surgeries.  Dr. Norris did not opine when the first surgery is likely to occur.  He testified that, pursuant to "published research [that] follows humeral head replacements over a 15-year period," the cobalt-chrome ball "will actually shift into the shoulder blade about half a millimeter to a millimeter a year."  Only an expert can gauge when the shifting of the ball will require further surgery, and Dr. Norris did not testify on this point.  Dr. Norris wanted to wait as long as possible before performing surgery on the shoulder socket "because once he has something done to the socket, that stuff *can* wear out in 10 or 15 years and then it needs to be redone." (Italics added.)  As used in this context, "can" means "may."  Dr. Norris did not indicate the probability that, after the first surgery, respondent's shoulder socket would need to be redone every 10 to 15 years.

Dr. Tauber's testimony does not fill the gap in Dr. Norris's testimony.  Dr. Tauber testified that in his deposition Dr. Norris had opined that respondent would eventually need a full

14

shoulder replacement (the first surgery), but Dr. Tauber could not remember when Dr. Norris believed the first surgery would occur.  Dr. Tauber further testified that Dr. Norris had opined that, after the first surgery, respondent would need "several revisions."  Dr. Tauber did not say that Dr. Norris believed respondent would need three revisions at 15-year intervals.  Nor did he say whether Dr. Norris had indicated the probability of the future revisions.  Thus, based on Dr. Norris's and Dr. Tauber's testimony, a reasonable trier of fact could not find that it is reasonably certain respondent will need three future shoulder revisions.

We are left with the testimony of Edward Bennett and John Nordstrand.  Before preparing his life care plan report, Bennett spoke to Dr. Norris about the medical care respondent would need over his lifetime.  Bennett included in the report only "those things that [respondent] will have to a reasonable degree of medical probability."  Bennett's "methodology" was to "[l]ook at the records, contact the doctors, ask what is reasonably required within a reasonable degree of medical probability and determine the cost factors."  Bennett asked respondent's doctors, "[W]ithin a reasonable degree of medical probability what are the needs that [respondent] has futuristically from a medical standpoint[?]"  However, in his testimony Bennett said nothing about respondent's need for future shoulder surgeries.

Nordstrand is the only witness who provided information about the number and dates of respondent's future shoulder surgeries.  He relied on Bennett's life care plan report and did not read Dr. Norris's deposition.  According to Nordstrand, the report includes costs for a shoulder "arthroplasty" surgery at age 31 and three subsequent shoulder

15

"revision" surgeries at 15-year intervals. The first revision would occur at age 46, the second at age 61, and the third at age 76. It is reasonable to infer that Dr. Norris told Bennett that, *to a reasonable degree of medical probability*, respondent would require these surgeries.

Nordstrand's testimony about respondent's future surgeries consists of multiple hearsay statements - statements made by Bennett in his life care plan report that were based on statements made by Dr. Norris. Appellant did not object on hearsay grounds to Nordstrand's or Bennett's testimony. Therefore, the multiple hearsay statements are competent evidence. (*People v. Panah* (2005) 35 Cal.4th 395, 476.)

Appellant claims that the "hearsay statements attributed to Dr. Norris cannot support the award" because "a party cannot prove case-specific facts by having an expert repeat hearsay statements." Appellant relies on *People v. Sanchez* (2016) 63 Cal.4th 665. There, our Supreme Court held: "When any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay." (*Id*. at p. 686.) Appellant forfeited the *Sanchez* hearsay argument because he never made a hearsay objection. (*People v. Stevens* (2015) 62 Cal.4th 325, 333.)

That the multiple hearsay statements are competent evidence does not mean that they constitute substantial evidence. (See *Gregory v. State Bd. of Control* (1999) 73 Cal.App.4th 584, 597 ["The admissibility and substantiality of hearsay evidence are different issues"].) "'Expert medical opinion . . . does not always constitute substantial evidence . . . .' [Citations.]" (*Lockheed Martin Corp. v. Superior Court* (2003) 29 Cal.4th 1096,

16

1110.) "[A]n expert's opinion is no better than the reasons upon which it is based. [Citations.]" (*Ferreira v. Workmen's Comp. Appeals Bd.* (1974) 38 Cal.App.3d 120, 126.) "'"The chief value of an expert's testimony . . . rests upon the *material* from which his opinion is fashioned and the *reasoning* by which he progresses from his material to his conclusion . . . ."'" [Citation.]" (*People v. Coogler* (1969) 71 Cal.2d 153, 166.) "Accordingly, whether [Dr. Norris's, Bennett's, and Nordstrand's] testimony was substantial evidence in support of the [jury's] findings must be determined by the material facts upon which [Dr. Norris's] opinion was based and by the reasons given for his opinion." (*Hegglin v. Worker's Comp. App. Bd.* (1971) 4 Cal.3d 162, 169-170.)

As to the three future shoulder revisions at 15-year intervals, the record discloses the material facts upon which Dr. Norris's opinion was based and the reasons for his opinion. Dr. Norris testified that, over time, the rubbing of the metal ball against respondent's shoulder socket will wear away the socket. The ball "will actually shift into the shoulder blade about half a millimeter to a millimeter a year." This evidence constitutes a sufficient basis for Dr. Norris's opinion that, to a reasonable degree of medical probability, respondent will need a shoulder socket replacement at age 31. Dr. Norris also testified that, "once . . . something is done to the socket, that stuff can wear out in 10 or 15 years and then it needs to be redone." This evidence constitutes a sufficient basis for his opinion that, to a reasonable degree of medical probability, respondent will need a revision surgery every 15 years for a total of three future revisions.

Dr. Norris told Bennett that the four future surgeries were necessary "within a reasonable degree of medical probability." This standard is not the same as the case law

17

standard requiring that future surgeries be "reasonably certain to occur." (*Garcia, supra,* 156 Cal.App.4th at p. 97.) But "[i]t is 'not required' for a doctor to 'testify that he [is] reasonably certain that the plaintiff would [need to undergo surgeries] in the future. All that is required to establish future [surgeries] is that from all the evidence, including the expert testimony, . . . it satisfactorily appears that such [future surgeries] will occur with reasonable certainty. [Citations.]' [Citation.]" (*Id.* at pp. 97-98, first, second, and second to last brackets in original, other brackets added; accord, *Regalado v. Callaghan* (2016) 3 Cal.App.5th 582, 602 (*Regalado*).) "'[I]t is generally a question for the [trier of fact] to determine from the evidence whether or not the claimed prospective detriment is reasonably certain to occur.' [Citation.]" (*Ibid.,* last bracket added.)

Viewing all of the evidence in the light most favorable to respondent, we conclude that a "reasonable trier of fact could find" by a preponderance of the evidence that it is reasonably certain respondent will need four future shoulder surgeries. (*Rivard, supra,* 164 Cal.App.3d at p. 414; see *Regalado, supra,* 3 Cal.App.5th at p. 603 [based on evidence, including doctor's opinion that "Regalado would more likely than not need future surgery," the "jury could conclude it was reasonably certain that Regalado would require a future spinal surgery"].)

18

*Disposition*

The judgment is affirmed.  Respondent shall recover his costs on appeal.

CERTIFIED FOR PUBLICATION.


YEGAN, J.


We concur:


GILBERT, P. J.


PERREN, J.

Vincent J. O'Neill, Judge

Superior Court County of Ventura

_____

Horvitz & Levy, Lisa Perrochet and Curt Cutting; Law Offices of Mark G. Cunningham, Mark G. Cunningham, for Defendants and Appellants.

Lowthorp Richards McMillan Miller & Templeman, John H. Howard; Ferguson Case Orr Paterson, Wendy C. Lascher and John A. Hribar, for Plaintiff and Respondent.